# WHEELING.

WERDENBAUGH ADM'R. *et al. v.* REID *et al.*

Submitted June 19, 1882—Decided November 18, 1882.

1. A debtor in his lifetime conveys his lands to B. by deed, and after the death of such debtor certain of his creditors file their bill to set aside said deed as fraudulent and to subject the lands to the payment of their debts.  HELD :

   That B. the vendee of said lands, may contest the claims of such creditors on the ground that they are barred by the statute of limitations, or otherwise.  (p. 589).

2. The lien of a judgment, on which no execution has ever issued, will not be enforced in a court of equity in a suit brought after the lapse of ten years from the date of the judgment, and where the debtor dies the time in which it can be enforced may be less as in no case can it exceed five years after the qualification of his personal representative, unless, perhaps, it may be kept alive by suing out successive executions after the death of the debtor, or by having sued out a *scire facias* continued his right to do so.  (p. 600.)

3. The lien of a judgment ceases when the right to sue out execution on the judgment, or to revive it by *scire facias* is barred by the statute of limitations.  (p. 600.)

Appeal from and *supersedeas* to a decree of the circuit court of the county of Ritchie, rendered on the 24th day of June, 1881, in a cause in said court then pending, wherein C. Werdenbaugh, administrator, and others were plaintiffs, and John Reid and others were defendants, allowed upon the petition of Edward Reid and John Reid.

Hon. Thomas J. Stealey, judge of the fourth judicial circuit, rendered the decree appealed from.

The facts of the case appear in the opinion of the Court.

*Robert S. Blair* for appellants cited the following authorities:  25 Gratt. 371; 16 W. Va. 143; 10 Leigh 321; 12 Leigh 428; John. Law Rep. 161; 16 John. 191; 11 Leigh 160; Sto. Eq. Pl. (8th Ed.) 183; Bump on Fraud. Conv. 443.

*Edwin Maxwell* for appellees.

SNYDER, JUDGE, announced the opinion of the Court:

C. Werdenbaugh and others, judgment creditors of John Flynn, filed their bill in the circuit court of Ritchie county, in September 1879, against John and Edward Reid and others, to set aside, as fraudulent and voluntary, a conveyance for five hundred and sixty-eight acres of land, in said county, made by said John Flynn to said Reids, and to subject the said land to the payment of their judgments. The said conveyance is by deed, dated September 24, 1858, and duly recorded in said county, November 20, 1858. The first judgment of the plaintiffs was recovered in said county in February 1859, the last in February 1860, and all the others between those dates. It does not appear, nor is it claimed, that execution ever issued on any of the said judgments. After the recovery of said judgments and before the institution of this suit said John Flynn died, but at what time is not shown. The defendants, John and Edward Reid demurred to the plaintiffs' bill, and by answer they denied that the said deed to them was without valuable consideration, or that it was fraudulent, and they aver that all the plaintiffs' judgments have long since been paid and discharged, and they also, plead and rely on the statute of limitations.

Several questions were raised in the cause and argued before this Court, but in my view it is only necessary to consider one of them, and that is, the effect of the statute of limitations on the judgments of the plaintiffs. If they are barred by said statute, the decree of the circuit court must be reversed and thus the cause will be ended; therefore, I deem it unnecessary to state the facts bearing upon any other question.

In the case of a deceased debtor, the creditors have the right to contest the claims of each other by relying on the statute of limitations, or otherwise— *Woodyard* v. *Polsley*, 14 W. Va. 211. If, therefore, one creditor may plead or rely upon the statute against the claim of another, *a fortiori*, a purchaser, who stands in no less favorable position, may rely upon the bar of the statute to protect his land from the claims of creditors of his deceased vendor. In this cause,

then, the defendants, John and Edward Reid, it seems to me, are clearly entitled to rely on the bar of the statute.

Whether or not there is any limitation, other than the presumption of payment arising from the lapse of time, on the right of a judgment creditor to enforce the lien of his judgment in a court of equity against the real estate of his debtor, is a question of grave importance and one which, so far as I know, has never been directly decided by the Appellate Court of Virginia or of this State.

Upon the introduction of the feudal law in England, the feudatory was not only prohibited from alienating his land, but also from charging it with the payment of his debts; because this might tend to disable him from performing his military service. The goods and chattels of the debtor and the annual profits of his lands, as they arose, were the only funds which the law allotted for the payment of his debts other than debts due to the crown. These were secured and subjected by the common law writs *fieri facias*, and *levari facias*, and in some cases the person of the debtor was taken under the writ of *capias ad satisfaciendum* commonly called a *ca. sa.* Under neither of these writs could the creditor obtain the possession of his debtor's lands, but could only levy the growing crops, and his right to levy these was lost if the debtor aliened his lands. To remedy this and meet the demands of trade and commerce which had become matters of some consideration, a statute—Westm. 2, 13 ed. 1 ch. 18—was passed which enacted, that when a judgment was recovered in the King's courts the plaintiff should have his election, either to have a writ of *fieri facias*, or that the sheriff should deliver to him all the goods and chattels of his debtor, his oxen and beasts of the plough excepted, and the one-half of his lands until the judgment was levied, "upon a reasonable price or extent." In pursuance of this statute a new writ of execution, called *elegit*, was formed and brought into use. This statute and this writ as well as the common law writs of *fieri facias* and *ca. sa.*, as parts of the general law of England, became parts of the law of Virginia upon the settlement of the colony and continued such after the revolution and formation of the commonwealth. By an act of the General Assembly of Virginia, passed in 1748, which was essentially the

same as chap. 134, of 1 Rev. Code of 1819, these writs and the proceedings under them were defined.  It was provided that all persons who shall recover judgments in any court of record may, at their election, have either of said writs within the year, for taking the goods, lands, or body of the person against whom such judgment is obtained in the manner prescribed by the statute.  That is by the writ of *fieri facias* the goods and chattels of the debtor might be taken and sold by the sheriff to satisfy the judgment, and *the writ was made a lien on the personal property of the debtor* from the time it was delivered to the office to be executed.  1 Rev. Code § 13 chap 134.  By the writ of *elegit* all the goods and chattels of the debtor, (saving his oxen and beasts of the plough), and one moiety of his lands might be taken by the sheriff and delivered to the creditor by "reasonable price or extent;" and thereby the creditor became the absolute owner of the personal property, and was entitled to hold the moiety of the lands as his freehold until he shall have levied thereof his debts and damages.  The statute did not make this writ an express lien on the real estate of the debtor, but it extended the mandate of the writ so as to make it bind one moiety of the *lands and tenements of which the debtor was seized at the date of the judgment or at any time afterwards.*  By reason of this right to extend the lands the courts construed the writ to be *a legal lien* on the debtor's lands and tenements from the date of the judgment, and this lien was superior to all subsequent liens or conveyances to purchasers for valuable consideration without notice of the judgment.  .The courts declared expressly that the lien thus created was a *"legal lien."  Leake* v. *Ferguson,* 2 Gratt. 420; 1 Lomax Dig. (288).  And this lien existed as long as the judgment remained in force, and as long as the judgment was susceptible of being revived where revival was necessary.  *Watts* v. *Kinney,* 3 Leigh 272, 293; *Taylor* v. *Spindle,* 2 Gratt. 44; *Burbridge* v. *Higgins,* 6 Gratt. 119.

In-as-much, therefore, as the creditor had this legal lien on the real estate of the debtor, courts of equity, in cases where the estate was merely equitable and could not be extended, or where the rents and profits would not keep down the interest, or where the debtor had conveyed the land, would enforce the lien by a sale of the lands, and it would

in like manner sell the lands of deceased debtors where the rents and profits would not pay the debts in a reasonable time—*Blow* v. *Maynard*, 2 Leigh 29; *Tennent* v. *Patton*, 6 Leigh 196; *McClung* v. *Beirne*, 10 *Id.* 394.

And by the writ of *ca. sa.* the sheriff was commanded to take the debtor and keep him in jail until he paid the debt or delivered to the sheriff personal property to the value of the debt or took the oath of insolvency and surrendered all his property, real and personal, all his choses in action, in possession or held in trust for him; and such estate as he did not surrender by operation of the statute vested in the sheriff. By the tenth section of said statute and chap. 34, Acts 1820–21, this writ *was expressly made a lien on all the real and personal estate of the debtor from the time it was levied.* But this lien, while express, conferred upon the creditor but an inchoate right until the debtor took the oath of insolvency; and if he died in jail the security of the creditor was lost—*Stuart* v. *Hamilton*, 8 Leigh 507; *Rogers* v. *Marshall*, 4 Leigh 425.

The limitation on writs of execution, including *fieri facias*, *elegit* and *ca. sa.*, is continued in sec. 5, chap. 128, 1 Rev. Code 1819, p. 489, and is as follows:

"Judgments in any court of record within this commonwealth, where execution hath not issued, may be revived by *scire facias*, or an action of debt brought thereon within ten years next after the date of such judgment, and not after; or where execution hath issued, and no return is made thereon, the parties, in whose favor the same was issued, shall and may obtain other executions, * * * * for the term of ten years from the date of such judgment and not after."

This statute was under consideration in *Fleming* v. *Dunlop*, and Carr, J., said: "The object of the statute seems clearly to have been, to curtail the cases comprehended by each clause of the section, of some privilege; to limit proceedings on them; and the period it fixes in both cases is ten years. *Where no execution has issued, it makes that period annihilate the judgment.*" 4 Leigh 341. Thus, it clearly appears from this judge's views, that the lien of the judgment expired when the right to revive the execution became barred.

In determining the time within which the lien of a judg-

ment might be enforced in a court of equity, it was uniformally held that whenever the capacity of having execution upon the judgment was barred, the lien of the judgment was destroyed and no suit could be brought to enforce it—2 Minor's Inst. 272; 1 Lomax Dig. § 10, p. (288) and cases cited; *Taylor* v. *Spindle*, 2 Gratt. 44.

This was the condition of the law in Virginia when the Code of 1849 went into effect. By that Code the *ca. sa.*, which, as we have seen, was the most comprehensive of the writs of execution then in force, was abolished. This writ acted on the person and all the estate both real and personal of the debtor. It was expressly made by statute, *a lien on the real and personal property of the debtor* from the time it was levied. In its place the revisers of that Code undertook the difficult task of substituting other remedies as ample and effective as the one abolished. They were men of eminence and great legal learning and ability, and it must be supposed that they accomplished what they intended as near as could be; and it is not reasonable to assume that they intended or did in fact make any changes in the law other than such as were necessary to accomplish the substitution of one remedy for another. Referring to the matter the revisers in their report, page 843, say: " We will not undertake to say that the remedies now proposed to be substituted in the place of process to take the body for debt, will, in every possible case, attain for the creditor every thing that he can now attain by means of that process. But we express the opinion without hesitation, that in cases generally the rights of creditors will be better protected by the measures proposed than by those for which they are substituted; at the same time we get rid of the system of imprisonment for debt, which is regarded by so many as inconsistent with the liberal and enlightened spirit of the age."

To accomplish this substitution the revisers reported certain provisions which, after some verbal amendments, were adopted by the Legislature as they are now found in the Code of 1849, as chapters 186, 187 and 188.

By the sixth section of chapter 186, it is provided that:

" 6. Every judgment for money rendered in this State heretofore or hereafter, against any person, shall be a lien on

all the real estate of, or to which such person shall be possessed or entitled, at or after the date of such judgment," &c.

Section nine provides that:

"9. The lien of a judgment may always be enforced in a court of equity. If it appear to such court that the rents and profits of the real estate subject to the lien, will not satisfy the judgment in five years, the court may decree the said estate or any part thereof to be sold, and the proceeds applied to the discharge of the judgment."

Sections twelve and thirteen of same chapter are as follows:

"12. On a judgment, execution may be issued within a year, and a *scire facias* or action may be brought within ten years after the date of the judgment; and where execution issues within the year, other executions may be issued, or a *scire facias* or action may be brought within ten years from the return day of an execution on which there is no return by an officer, or within twenty years from the return day of an execution on which there is such return; except that where the *scire facias* or action is against the personal representative of a decedent, it shall be brought within five years from the qualification of such representative."

"13. No execution shall issue, nor any *scire facias* or action be brought on a judgment in this State, other than for the commonwealth, after the time prescribed by the preceding section, except that in computing the time, any time during which the right to sue out execution on the judgment is suspended by the terms thereof, or by legal process, shall be omitted," &c.　*　*　*

Section 2 of chapter 187, retains the writs of *fieri facias* and of *elegit.* To the *fieri facias* is given the same effect that it has always had; but by the seventh section the *elegit* is confined entirely to the real estate of the debtor and gives the creditor the right to extend, instead of one moiety, the whole of "the real estate of, or to which the debtor was possessed or entitled on or after the date of the judgment."

The writ of *ca. sa.* is abolished by section *two* of chapter 188, and section *three* makes the *fieri facias*, in addition to the effect given to it by chapter 187, from the time it is delivered to the officer, "a lien upon all the personal estate of, or to which the judgment debtor is possessed or entitled, although

not levied on, or capable of being levied on, under that chapter," &c.   And section *four* provides, that:

"4. The lien acquired under the preceding section shall cease whenever the right of the judgment creditor to levy the *fieri facias*, under which the said lien arises, or to levy a new execution on his judgment, ceases or is suspended by a forthcoming bond being given and forfeited, or by a *supersedeas* or other legal process."

In a note to section 2 of chapter 188, which abolishes the *ca. sa.*, the revisors, say: "By chapters 186 and 187, it is proposed so to enlarge the remedies against the debtor's real estate, that the whole may be subjected to his debts without the necessity of issuing a *capias ad satisfaciendum.*   Under chapter 187, the debtor's goods and chattels may be taken under a *fieri facias.*   This chapter (188) is framed to provide for the creditor (in place of taking the debtor under a *ca. sa.* and compelling him to take the oath of insolvency), as efficient remedies (in cases not provided for by the 1st and 2d sections) against all estate not subjected by other process, as he now has when the debtor is discharged by taking the oath of insolvency.   These remedies are in lieu of those provided by the acts in 1 R. C., p. 528, §§ 8, 9, 10, 11; p. 534, § 28," &c.   Other sections are referred to, all of which relate to the remedy by *ca. sa.*

It seems to me that a careful consideration of the provisions, character and expressed purpose of this legislation, will afford conclusive evidence that the principal, if not the sole object of the changes thereby introduced, was to substitute another remedy for the *ca. sa.* which it abolished; and that neither the revisors who prepared it, nor the Legislature that adopted it, had the most remote conception that they had created a lien on the real estate of the debtor which could be extended, by construction or otherwise, beyond the limitation theretofore fixed by law to the lien created by the *elegit*.   I am sure, so far as I have been able to learn, that when it was recently suggested, that there was no limitation to the right of a creditor to enforce a judgment-lien against the real estate of the debtor, it was a great surprise to the legal profession.   And it must have been equally a surprise to a number of eminent and learned legal text-writers in

Virginia; for Judge Lomax, Prof. Minor and Mr. Barton all of whom, in their excellent works on Virginia law, consider this legislation and not one of them even suggests a doubt about the limitation of such lien. 1 Lomax's Dig. (301) 395; 2 Minor's Inst. 272. "The right to enforce the lien of a judgment, although the statute declares that it may *always be enforced* in a court of equity, is confined to the time that an action may be brought or *scire facias* sued out thereon, and after that time the lien ceases to exist." 1 Barton Ch. Pr. 109, citing *Eppes* v. *Randolph,* 2 Call. 125; *Stuart* v. *Hamilton,* 8 Leigh 503; *Taylor* v. *Spindle,* 2 Gratt. 44; and *Brown* v. *Campbell,* 33 Gratt. 402.

While the statute declares that the judgment shall be a lien on the real estate of the debtor and that this lien may *always* be enforced in a court of equity, it was certainly never intended that the lien should exist independent of the judgment, nor that the word "always" should be taken as equivalent to *forever.* The lien is a mere incident or consequence of the judgment and without the latter the former can have no existence. All that could have been intended or effected by the statute, then, it seems to me, was to declare, that the lien shall attach to the lands of the debtor and may, without resorting first to the personal estate be enforced on a court of equity at any time while it existed, but it was not intended to declare that the lien should continue after all right to revive the judgment is barred by the statute, and has in effect, if not in fact, become annihilated. To assert that the lien, which is but the incident, may exist, after the judgment, to which it owes its existence, has become annihilated is, to me, incomprehensible. It is to assert, in my humble judgment, that a stream may exist without a source, a fabric without a base, an effect without a cause. It is to assert that a statute can make substance out of a shadow.

The 12th and 13th sections of chapter 186, before quoted, prescribe the limitation of proceedings to revive a judgment, and if I am correct in my conclusion that the lein ceases when the judgment ceases to be revivable, then the right to enforce the lien in a court of equity ceases when all proceedings to revive the judgment are barred by the said 12th and 13th sections of chapter 186 of the Code of 1849.

But another view may be taken which will result in the same conclusion. It will be observed that the Code of 1849, did not abolish the *elegit*, but extended its operation to "*all the real estate* of or to which the debtor was possessed or entitled on or after the judgment." The lien of the *elegit* has been construed by the courts, as we have seen, to be a direct, positive, legal lien from the date of the judgment, and the lien created by the statute is expressly made also a direct, positive, legal lien from the date of the judgment. The character and extent of these two liens are the same, and exist at the same time and operate upon the same property. Thus the creditor has two remedies to enforce the lien of his judgment—the one by resorting directly to a court of equity, and the other by resorting to his *elegit*. Now suppose he elects to resort to his *elegit*. If his debtor has fraudulently conveyed his real estate, or the rents and profits are insufficient to keep down the interest of the debt, or the estate is an equitable one, then the creditor, in either of these cases, must apply to a court of equity to enforce the lien of his *elegit*. But the decisions of courts of equity for over a century have declared that the right of the creditor to enforce such lien ceases whenever his right to sue out or revive his *elegit* has ceased. It must be presumed that the revisors and the Legislature, which gave the creditor these two concurrent remedies, knew that the lien created by the *elegit* ceased when the right to revive the *elegit* ceased, can it be supposed then that they intended the lien of the judgment created by the statute should continue after the right to revive the judgment had ceased? If the creditor elected one remedy, his right was subjected to a limitation; if the other it was not. Thus cases might occur in which his success or failure would depend not upon his right but upon the form of the remedy he sought. Is it reasonable to infer that the Legislature intended to create such an anomaly? Is it not just and and reasonable to suppose that it was intended to give the lien the same limitation regardless of the remedy which might be taken for convenience or by accident? Or if the matter is doubtful, is it not the duty of a court of equity to apply the limitation to the lien of the *elegit* to the lien created by the statute? It is a principle uniformly recognized and acted upon by courts

of equity that where concurrent remedies exist to one of which a limitation is prescribed and to the other none, such court will apply the prescribed limitation to both. *Carr* v. *Chapman*, 5 Leigh 164; *Brown* v. *Campbell*, 33 Gratt. 402.

Therefore, the analogy between the lien of the *elegit* and that of a judgment created by the statute—would indicate and fix the limitations prescribed to the right to enforce the lien of an *elegit* as the proper limitation to the right to enforce the statutory lien of a judgment, if no other limitation has been prescribed.

These views are strongly supported by the spirit manifested in the said Code of 1849. Before its adoption there were many actions to which no statutory limitations were prescribed. In framing the said Code the revisors and the Legislature exhibited clearly an intention to prescribe a statutory limitation in every instance where it was at all proper or even possible; and in many cases where limitations existed before, the period was reduced; thus indicating distinctly an evident purpose to reward the diligent and punish the negligent. It is scarcely rational to suppose, then, when actuated by this manifest purpose, that the Legislature could have intended to create by statute an indefinite lien while it at the same time enlarged and continued an existing lien of the same character without removing the limitation attached to it. It seems to me, therefore, whether the manifest intention of the framers of the Code or the analogies and spirit of the legislation enacted by them is to control and guide us, the right to enforce the lien of a judgment in a court of equity must be treated as ceasing by the laws of Virginia, after the Code of 1849, went into effect, whenever the right to revive the judgment, which created such lien, ceased.

Such, as I understand it, was the law of this State on the 1st day of April 1869, when our Code of 1868, went into effect. By chapters 139, 140 and 141 of that Code, the provisions of chapters 186, 187 and 188 of the Code of Virginia, hereinbefore given, were adopted and made parts of the laws of this State with some modifications, which have no bearing whatever on the question under consideration, except that, by the 2d section of chapter 140, the writ of *elegit* is abol-

ished, and the *fourth* section of chapter 188 of the Code of Virginia is modified and made the *third* section of chapter 141 of our Code and as modified reads as follows :

"3. The lien acquired under the preceding section shall cease whenever the right of the judgment creditor to levy the writ of *fieri facias* under which said lien arises, or to levy a new execution on his judgment, ceases or is suspended by an undertaking being given and forfeited, or by an appeal *or otherwise.*"

It will be noticed, that the change made in this section consists in the substitution of the word, *"otherwise,"* for the words, *"other legal process,"* found in the Code of 1849. The effect produced by this change is very important; because the correct interpretation and meaning of the section as it stands in the Code of 1849, is, that the lien of the *fieri facias* shall cease when the right to levy any execution on the same judgment *shall cease by reason of* "a *forthcoming bond* being given and forfeited," or *by reason* of "a *supersedeas or other legal process."* *Trevilian* v. *Guerrant,* 31 Gratt. 525. Thus causing the lien to cease only in the special cases mentioned. But by the substitution of the word *"otherwise,"* in the Code of 1868, the effect is to cause the lien ot the *fieri facias* to cease, when the right to levy a new execution on the judgment ceases from any cause whatever, whether by the payment of the debt, the statute of limitations or otherwise.

This change in the statute seems to have been made necessary by the abolition of the writ of *elegit.* For, if the limitation to the right to enforce the express lien of a judgment in a court of equity, was dependent upon the analogy between the lien of the *elegit* and the express lien given by the statute, as we have supposed, then the abolition of the *elegit* might destroy the analogy and leave no analogy by which the right to enforce such lien in a court of equity could be limited, if the modification, above noticed, had not been made.

Assuming, then, that the limitation upon the right of the creditor to enforce the lien of his judgment in a court of equity against the lands of his debtor, was wholly dependent upon the analogy between such lien and the lien of an *elegit,* it necessarily follows that, if the lien of a *fieri facias*

is analogous to that of the *elegit* heretofore existing, the limitation prescribed by the statute to the right to enforce the lien of a *fieri facias* must limit the right to enforce the lien of a judgment. Is there such analogy? The lien of a *fieri facias* attaches from the time the creditor has the right to levy it on the debtor's property, and not from the time he has the right to issue it, and it having once attached the lien continues thereafter without any actual levy so long as the right to levy any execution on the same judgment exists—*Charron* v. *Bonvell*, 18 Gratt. 218; so the lien of an *elegit* attached when the capacity to sue out the *elegit* arose and not at the time it could be levied, and having once attached to the debtor's property it, like the lien of the *fieri facias*, continued thereafter without any actual levy so long as the capacity to sue out any *elegit* on the same judgment existed. Thus the analogy between the lien of a *fieri facias* and that of the *elegit*, being perfect, and the courts having adopted the analogy between the lien of the judgment created by the statute and that of the *elegit*, as we have heretofore assumed, it would seem to follow necessarily that they must now follow the analogy of the lien of the *fieri facias*, this analogy having came into existence at the same time the *elegit* was abolished. Of course in carrying out this analogy the lien of a judgment must now be regarded as ceasing when the capacity to sue out any execution on the judgment ceases, and not when the right to levy any execution ceases, as does a *fieri facias*. The lien of a *fieri facias* ceases by operation of section 3 chapter 141 of the Code of 1868, above quoted, whenever the right to levy any execution which may be sued out on the same judgment ceases, and the right to levy can not exist after the right to sue out a *scire facias* on the judgment is barred. This bar is fixed by sections 11 and 12 of chapter 139 of the Code of 1868, at ten years when no execution has ever been issued on the judgment; consequently, the right to levy any execution in such case must cease after ten years from the date of the judgment, and by the statute the lien of a *fieri facias* must cease at the same time. The lien of a judgment on lands which ceases when the capacity to sue out execution ceases must of course cease at the same time that the lien of the *fieri facias*

would cease, except in the single instance when the debtor dies. In that case the *scire facias* must be brought within five years from the qualification of the representative of such deceased debtor, and after five years from such qualification the lien of the judgment on the land of decedent must cease; unless, perhaps, it might be kept alive longer by the suing out of successive executions after the death of the debtor, or, by having sued out a *scire facias* against his personal representative, continued his right to do so. *Braxton* v. *Wood,* 4 Gratt. 25; *Smith* v. *Charlton,* 7 Gratt. 425; but the lien of the *fieri facias* given by section 2 of chapter 141 of Code of 1868 would cease from the death of the debtor, for the right of the creditor to levy a new execution on his judgment must cease at the death of the debtor.

In the case at bar no execution ever issued on any of the judgments in the plaintiffs' bill mentioned and sought to be enforced and the statutory bar, as we have seen, in such cases can never exceed ten years from the date of the judgment and may be less where the debtor dies after judgment. The record in this case shows that John Flynn, the debtor, did die after the judgments were recovered, but it does not appear when his personal representative qualified if at all. In any event, therefore, the right of the plaintiffs to enforce the lien of their judgments against the land in the bill mentioned has ceased.

The decree of the circuit court must, therefore, be reversed and the plaintiffs' bill dismissed with costs to the appellants against the appellees other than E. C. C. Lee.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED.   BILL DISMISSED.