# CHARLESTON.

BESSIE A. DAVIS *et al. v.* DAVIS TRUST COMPANY

(No. 6204)

Submitted March 12, 1929.    Decided March 19, 1929.

142

*Henry M. Earle, Rummell, Blagg & Stone* and *H. G. Kump,* for appellants.

*S. T. Spears, R. S. Irons* and *Frank Cox,* for appellee.

Maxwell, Judge:

By the terms of an agreement dated January 1, 1905, John T. Davis and the other stockholders of Davis Colliery Company sold to Coal & Coke Railway Company all of the capital stock (20,000 shares) of the colliery company at the price of $2,000,000 to be paid at the option of the purchaser, and until the exercise of the option, which was indefinite as to time, the purchaser was to pay, after the year 1908 (there being less amounts stipulated for the years 1905-1908, inclusive), the sum of $80,000 per annum as interest on the amount of said purchase price. The contract required the delivery of the certificates of said stock to the Trust Company of West Virginia at Elkins (now Davis Trust Company) to be held by the trust company in escrow and to be delivered by it to the railway company when the latter should pay the purchase money. The trust company was to disperse the

annual interest among the owners of said stock in proportion to their holdings. John T. Davis owned nearly one-half of said stock. The option to purchase was never exercised, but the interest was fully paid until about 1915.

On the 25th day of May, 1914, an agreement was entered into between John T. Davis of the one part, and his wife, Bessie Armstead Davis, and Alice M. Armstead and Henry H. Armstead, relatives and trustees of Mrs. Davis, of the other part, under the terms whereof Mr. Davis agreed to pay to his wife the sum of $7,500 annually in equal monthly installments during her life, the same to be secured by a deed of trust executed contemporaneously with said agreement.

The trust, duly executed on the last mentioned date by John T. Davis to Davis Trust Company, Trustee, carried an assignment by the grantor to the trustee of a portion of the grantor's share of the $80,000 annual interest to be paid by the railway company to the stockholders of the colliery company, sufficient to pay to Mrs. Davis the annuity above mentioned, and, in event the railway company should consummate the purchase of said stock by paying the agreed price of $2,000,000, there was assigned to the trustee $175,000, part of the share of John T. Davis in said purchase money, "in trust for the purpose of securing and paying to the said Bessie A. Davis the said annuity." Said fund, if it should arise by the exercise of said option, was to be invested by the trustee in good securities, and out of the income therefrom the annuity was to be paid to Mrs. Davis, and at her death the fund with unused income thereon was to be paid in equal shares to Hallie Elkins Davis and Henry G. Davis, children of John T. and Bessie A. Davis, if of age, otherwise to their guardian. The trustee by formal endorsement duly accepted the trust and proceeded in the discharge of the duties thereby imposed.

Senator Henry G. Davis, father of John T. Davis, died in 1916. Following his death it became apparent not only that the Davis Colliery Company and the Coal & Coke Railway Company, of the latter of which Senator Davis was president, and in both of which he was largely interested, were very seriously involved financially, but that by reason of extensive

endorsements for those companies by Senator Davis, his estate was also considerably involved. The executors of the Senator's will found it necessary to evolve some plan by which the estate could be relieved from this entanglement. Consequently, with the assistance of Mr. Charles D. Norton of New York, and his associates, there was developed in 1917 the so-called Norton Syndicate Plan under which, among other things, there was turned over to the syndicate by the executors of the Davis estate all of the preferred and common stock of the Coal & Coke Railway Company owned by said estate, also all claims of the estate against the railway company and the colliery company. The rights of the railway company under the aforementioned contract of January 1, 1905, were likewise assigned to the syndicate. On the other hand, the Davis estate was relieved of all liability on account of endorsements of Senator Davis for the railway company and the colliery company, and there were delivered to the executors and interested parties $941,000 of the mortgage bonds of the railway company and $2,167,700 preferred stock of the newly organized West Virginia Coal & Coke Company. In the consummation of this plan all of the capital stock of the colliery company was turned over to the Norton Syndicate, and after the re-adjustment Mr. Davis placed with the trustee $175,000 of the capital stock of the new company to be held by the trustee, in trust, for the benefit of Mrs. Davis and as an assurance for her annuity.

Through the years from 1914 to February, 1927, Mrs. Davis' annuity was regularly paid to her. The institution of this suit interrupted further payments.

This suit was instituted by Mrs. Davis and her two children against the trust company in February, 1927. The plaintiffs allege, among other things, that they did not know until early in the year 1925 that the trust company had accepted stock of the West Virginia Coal & Coke Company in lieu of the moneys and funds provided for by the trust agreement of May 15, 1914; that such action on the part of the defendant constituted a plain violation of the trust and is without effect as to the plaintiffs. The principal object of the suit is to declare null and void the action of the defendant

in accepting the stock of the new company, and to require the trustee to make whole the said trust fund in the amount of $175,000; also that there be an accounting, and a new trustee appointed.

The circuit court found for the defendant and dismissed the plaintiffs' bill. The plaintiffs appeal.

It is abundantly proven by the evidence that immediately prior to the adoption of the Norton Syndicate Plan the stock of the colliery company was practically worthless because of the large indebtedness of that company. It cannot be said therefore that the sale or transfer of the capital stock of that company to the Norton Syndicate entailed any loss to the plaintiffs or prejudiced their rights.

In fact it is not apparent that the plaintiffs Henry G. Davis and Hallie Davis Percy (nee Hallie Elkins Davis) could on any theory maintain this suit. Their interest in the aforesaid sum of $175,000 was contingent entirely upon the railway company's exercising its option of purchase of the stock of the colliery company and paying the $2,000,000 consideration provided for by the contract of January 1, 1905. The trust provides, in event the railway company shall pay the $2,000,000 purchase price for the colliery stock, that $175,000 of the share of John T. Davis should be paid to the trustee; and that after the death of Mrs. Davis (her annuity being paid to her from the income from said fund), the trustee should "turn over whatever sum shall yet remain of said fund to Hallie Elkins Davis and Henry Gassaway Davis, in equal shares, or to their guardian if they shall not then have arrived at the age of twenty-one years * * *." The railway company not having exercised its option to pay the agreed purchase price for the stock of the colliery company and the $175,000 capital stock of the latter company not being replaced with cash as contemplated by the trust agreement, the contingency failed on which the contemplated interest of the two children was predicated. They therefore have no interests involved in this suit.

When the Norton plan was under discussion, counsel for the Norton Syndicate deemed it advisable to obtain the consent thereto of the parties in interest. With the view of ob-

taining the consent and approval of Mrs. Davis, Mr. Arthur Lee, who was one of the executors of the will of Senator Davis and a director of the trust company, called on Mrs. Davis at her home in the city of Washington and obtained from her a writing touching the matter. This writing is not in evidence and seems to have been lost. Mr. Lee is dead. Also, Mr. W. G. Wilson, who was then president of the Davis Trust Company, is now deceased. Mrs. Davis testifies that on the occasion of Mr. Lee's calling upon her at Washington, he told her that the executors and interested parties were putting through an adjustment in New York, and that they were all going to get their money, and that that was the only way for her to get her money, and the only thing to save the family at that time; and ''he said he wanted me to write a letter to him showing that. I approved of this New York plan, which I did; I wrote a letter and he took it with him.'' She says she was not informed by any one that it was proposed to substitute new stock for the old. She says that at that time she had not heard of the Norton Plan or Syndicate nor of the proposed West Virginia Coal & Coke Company. She takes the position in this suit that the letter she gave to Mr. Lee carried her approval of the ''New York plan'', as she calls it, but that she in no manner approved a substitution of new stock as a basis for guarantee of her annuity under the 1914 agreement and trust. When asked on cross-examination if she saw Mr. Lee on more than one occasion during these negotiations, she admits, ''I suppose I saw him several times.'' Mrs. Lee says that Mrs. Davis agreed to the Norton Syndicate Plan; that after *long discussion* Mrs. Davis signed a paper for Mr. Lee.

Judge Ira E. Robinson was counsel for the executors of the will of Senator Davis and was active in the matters and affairs which were consummated under the Norton Syndicate Plan. As a witness in this cause for the defendant, he testifies, ''all parties, either in the agreement or whose interest would be affected by the agreement, acquiesced in that which brought about an exchange of stock made necessary in the consummation of the Norton transaction;'' that Mrs. Davis ''executed a written consent in relation to the substitution of the one stock

for the other.'' He further says, ''The substance and effect of the paper (meaning the one signed by Mrs. Davis) was that the stock of the newly formed coal company, the West Virginia Coal & Coke Company, should be substituted for that already held under the alimony agreement.'' This last answer of the witness is criticized by counsel for the plaintiff. They say that at the time of the giving of the writing by Mrs. Davis to Mr. Lee the West Virginia Coal & Coke Company had not been organized, and that there could have been no approval by Mrs. Davis of a substitution of stock of a non-existent corporation as stated by the witness. Admitting that the expression of the witness in this particular is inexact in its phraseology as to the sequence of events, his testimony is not thereby impaired in its underlying import, that is, that Mrs. Davis consented to the plan that was being worked out by the executors and others in interest to save the Davis estate, and that plan included as an essential element the turning over by the trust company of the colliery stock to the Syndicate and the organizing of a new company, a certain portion of the stock whereof was to be distributed among the parties in interest.

Mr. E. A. Bowers, who had been counsel for the Coal & Coke Railway Company and the Davis Colliery Company for a number of years previous to the consummation of the Norton agreement and who was active in the negotiations leading up to that agreement, testified as a witness for the defendant. He says that they were not taking any chance on anything that they could put in better shape than they found it; that it is his recollection there was a paper signed by Mrs. Davis and that he saw her signature to that paper; that counsel were satisfied that Mr. Norton would get absolute control of the Davis Coal & Coke stock. While Mr. Bowers does not undertake to say specifically what were the contents of the paper signed by Mrs. Davis, it is apparent from his testimony that the paper was sufficient to clear up the matter as to her interest, and such would not have been the case if the tenor and effect of the instrument was not such as to approve the assignment of the colliery stock to the syndicate.

Under the Norton Syndicate Plan John T. Davis was to

receive and did receive a large block of the preferred stock of the West Virginia Coal & Coke Company, but neither he nor the trustee was to receive or did receive any money in the transaction. The settling of the whole affair was such that its very circumstances are corroborative of the finding that Mrs. Davis knew the essential elements of the arrangements that were being worked out and that she consented thereto. Our analysis of this situation, as, in fact, of the whole case save as to certain installments of annuity, is in conformity with the conclusions reached by the able trial chancellor. Even if we entertained doubt as to the correctness of his findings on the questions of fact, we would not be warranted in disturbing the decree on the facts unless we were convinced that it is plainly against a preponderance of the evidence. "In equity the finding of any fact by the circuit court will not be disturbed upon an appeal, unless contrary to the plain preponderance of the evidence." *Ruckman* v. *Cox,* 63 W. Va. 74. Also *Weaver* v. *Akin,* 48 W. Va. 456, and many cases there cited. The action of the circuit court in dismissing the bill would be affirmed but for one item of accounting hereinafter to be noted.

Complaint is made by the appellant that the court did not require an accounting by the trustee. The record carries a statement furnished by the trustee and in the absence of any challenge of its verity the same should be taken as correct as to the amounts received and paid out, though serious question is raised as to the right of the trustee to make certain of the disbursements in the manner in which they are there shown to have been made. Down to the time of the institution of this suit in February, 1927, Mrs. Davis had been paid her annuity in full. For about three years following the separation agreement of 1914, Mr. Davis paid the annuity direct to Mrs. Davis. From March 1, 1917, to about the middle of the year 1923 Mrs. Davis' monthly draft of $625.00 drawn on Mr. Davis was paid by the trust company and charged to his account. These drafts aggregated $47,500.00. From July 18, 1918, to June 30, 1923, the dividends on the $175,000 capital stock of the West Virginia Coal & Coke Company aggregated, less commission to the trustee, $40,740.

This latter amount was turned over to Mr. Davis by the trust company to cover *pro tanto* the said annuity payments which had been charged to him from March 1, 1917, to June 1, 1923.

The $175,000 capital stock of the West Virginia Coal & Coke Company was turned over to the trustee as aforesaid in the early part of February, 1917. No. dividends were paid on this stock until July 18, 1918. On this phase of the case there are therefore presented for determination two serious questions. First, whether Mr. Davis is entitled to reimbursement from the dividends received from and after July, 1918, for the seventeen monthly installments of the annuity which he paid from March 1, 1917, to July 1, 1918, inclusive; and second, whether he is entitled to reimbursement for the monthly installments of annuity which he discharged subsequent to July, 1918, during the period through which dividends were paid on the stock.

The separation agreement and the trust executed by Mr. Davis bear the same date. The trust was supplementary and incident to the agreement. They must be read and considered together. The agreement provides: "That the said John T. Davis shall pay, or cause to be paid, to the said Bessie A. Davis out of his estate an annuity or yearly sum of Seven Thousand Five Hundred ($7,500.00) Dollars in equal monthly installments, without interest, beginning on the first day of June, 1914, for and during the term of the natural life of the said Bessie A. Davis, and shall further secure the payment of same by deed of trust, bearing even date herewith, executed by the said John T. Davis to the Davis Trust Company, a West Virginia Corporation, Trustee * * *." There is a further provision in the agreement that "if the fund provided for by said deed from which said Bessie A. Davis is to be paid said sum of $7500.00 per annum, should, for any cause, fail so that said sum should not be realized therefrom annually by said Bessie A. Davis, then said John T. Davis shall make good to her said annual payments (in equal monthly installments) and the same shall be a charge upon his estate." Under the trust which was executed by Mr. Davis we find that the said trustee was "author-

150

ized and empowered and directed to pay over to the said Bessie A. Davis, or to her lawfully authorized and constituted attorney in fact, the said annuity or yearly sum of Seven Thousand, Five Hundred Dollars ($7,500.00) in equal monthly installments, as above set forth, and without interest, for and during the term of her natural life, out of any moneys coming into her hands arising out of the said contract or agreement as above mentioned, if the said annuity or yearly sum shall not have been previously paid in installments as aforesaid by the grantor, or some one for him, * * *.''

From these papers it is evidence that one of their principal purposes was to provide an annuity for Mrs. Davis. The above quoted provisions of the two instruments indicate the intention of Mr. Davis to assume personal responsibility to discharge the annuity. His initial promise to pay the annuity or cause the same to be paid, and his further undertaking, in event of the failure of Mrs. Davis to receive her annuity from the fund created by the trust, to make good to her the said annual payments, and constituting the same a charge upon his estate, clearly discloses his recognition of his personal and primary liability. This means simply that when there was no income from the trust fund he was to pay annuity installments out of his personal funds. It follows that Mr. Davis was not entitled to be reimbursed, from income later paid from the trust fund, for the seventeen months, March 1, 1917, to July 1, 1918, inclusive, during which time there was no income received from the said fund. To the extent of this unwarranted reimbursement the trustee must be held to account, with interest, less taxes and commission. Nor do we think that, as urged by the defendant, there is an estoppel against Mrs. Davis precluding her from asserting her rights in this particular because of the averment in her bill that the annuity had been paid to her by the defendant down to the time of the institution of this suit. A part of the same averment is that she did not know out of what funds the payments had been made. On the other hand, during the period from August 1, 1918, to June 1, 1923, the trust fund produced income more than sufficient to discharge the annuity and it follows that Mr. Davis should

have been relieved from personal responsibility for the annuities during that period, and having paid the same he was entitled to reimbursement, subject, however, to the countercharge for the seventeen installments for which he had been improperly reimbursed as aforesaid. The above mentioned account also shows that from 1923 to 1927 the trustee received in dividends on the $175,000 coal company stock $31,500, whereof it paid to Mrs. Davis in annuity installments the sum of $27,500. The residue, less tax deductions and commission, remains with the trustee and is available for Mrs. Davis. Inasmuch as the record does not disclose the information necessary to a determination of the exact amount due from the trust company on account of the seventeen monthly installments of annuity for which it improperly reimbursed Mr. Davis out of the trust fund, it will be necessary for this cause to be remanded to the circuit court of Randolph county for that matter to be properly ascertained and adjudicated. It is not apparent to us that there is occasion for an accounting other than for the period of seventeen months indicated.

For the reasons above stated, we reverse the decree dismissing the plaintiffs' bill and remand the cause for further proceedings in accordance herewith.

*Reversed and remanded.*