SOUTHERN COOPERATIVE FOUNDRY COMPANY *v.* WARLICK
FURNITURE COMPANY *et al.*

(No. 8222)

Submitted April 8, 1936.    Decided April 21, 1936.

*French & Easley,* for plaintiff in error.
*Luther G. Scott,* for defendant in error.

HATCHER, PRESIDENT:

This is a proceeding in garnishment.    From a partial recovery herein the plaintiff, Southern Cooperative Foundry Company secured a writ of error.

The plaintiff is the judgment creditor of Warlick

Furniture Company, a corporation. On April 2, 1934, an execution was issued on plaintiff's judgment and placed in the hands of the sheriff to be executed. On April 4th, plaintiff filed a statutory suggestion in the clerk's office, suggesting that Warlick Furniture Store, Inc., was liable to it by reason of the lien of the execution against the Furniture Company. On April 10th, a summons on the suggestion was served on the Furniture Store. On April 27th, the execution was served on the Furniture Company and was returned to the clerk's office on May 7th, endorsed "no property found." The service and the return were later marked out, and the execution endorsed by the sheriff "This writ returned unserved, at the request of the plaintiff's attorneys * * * this 27th day of April, 1934." On May 14th, the Furniture Store answered the suggestion, setting forth its acquisition of the assets of the Furniture Company and pleading immunity from the suggestion. On May 21st, the plaintiff replied, charging specifically that the transactions between the Furniture Company and the Furniture Store were "for the purpose of hindering and delaying this plaintiff and other creditors from collecting their claims against Warlick Furniture Company, Inc." On November 13th (1934), the Furniture Store filed a supplemental answer attempting to justify the transactions and denying that they were designed to hinder or delay the creditors of the Furniture Company.

The Furniture Store contends initially that by having the execution returned *unserved,* the plaintiff "abandoned the lien of its execution and thereafter the garnishment had no foundation and was void." Abandonment of the lien must be "distinctly and clearly proved." 23 C. J., subject Executions, sec. 365; 11 A. and E. Ency. Law, *idem,* p. 692. The motive for requesting the return of the execution unserved is not apparent. If the request stood alone, and further action on the suggestion had been deferred, abandonment might be deduced. But following the return, pleadings were filed and evidence taken by both parties and this case seasonably prosecuted

to final judgment without abandonment ever being suggested. The conduct of the parties themselves demonstrates that whatever was thought of the request at the time, neither party understood then that it evinced abandonment. Code, 38-4-8, provides that the delivery of an execution to the sheriff, to be executed (which was done in this case) shall create a lien on the property of the judgment debtor "although such property was not levied on or capable of being levied on" and that "such lien shall continue beyond the return day of the execution whether the writ was levied or not," and ceases only when *the right of the judgment creditor to levy ceases. Huling v. Cabell,* 9 W. Va. 522, 27 Am. Rep. 562; *Werdebaugh v. Reid,* 20 W. Va. 588; *Birch River Co. v. Glendon Co.,* 71 W. Va. 507, 76 S. E. 972. Consequently, the vitality of such a lien is not affected by the manner of its return. When the lien has once attached, it survives the execution, and expires only when the right of the judgment creditor to levy expires, unless he abandons the writ or perverts it to a use actively or constructively fraudulent. We recognize the qualification that when an execution is suspended, the priority of the lien may be subordinated to the right of a junior execution lienor or a bona fide purchaser. But that involvement does not arise here. Neither were the defendants prejudiced in any apparent manner by plaintiffs request to return the execution unserved. Hence, the request did not impair plaintiff's lien as against the defendants. See generally *Dryer v. Graham,* 58 Ala. 623; *Griffin v. Wallace,* 66 Ind. 410; *In Re McCarthy Bros.,* (C. C. A.) 245 Fed. 737, 740-1; Freeman, Executions (3rd Ed.), sec. 206; 23 C. J., *supra,* sec. 368.

The Furniture Store further contends that garnishment is not a proper proceeding in which to test its association with the Furniture Company. We determined in *Emmons-Hawkins Co. v. Sizemore,* 106 W. Va. 259, 145 S. E. 438, that when the judgment debtor's property has been fraudulently conveyed, as plaintiff charges, garnishment is a proper procedure. The Fur-

niture Store asserts that the question of fraudulent conveyance "was never raised or considered" in the circuit court. The latter wrote no opinion, so we cannot say as to the consideration given the question; the pleadings, however, show clearly that the question was raised.

The following facts are developed by the evidence. The Furniture Company became embarrassed financially in 1932, and submitted its affairs to the supervision of a creditors' committee until January 1, 1934. Towards the last of that period another corporation, Warlick Furniture Store, Inc., was formed. It had the same officers and was controlled by the same parties as the Furniture Company. "Most" of the stockholders in the old company were stockholders of the new. (In fact, the only new stockholder was the son-in-law of the president, and whether or not the son-in-law was a nominal or an actual stock subscriber does not appear.) The admitted purpose of the new organization was to take over the business of the Furniture Company. Some of the stockholders of the two corporations turned over "approximately" $5,000.00 to L. G. Scott, with which sum he secured the assignment to himself, as their trustee, of a number of unsecured claims against the Furniture Company amounting to $24,217.95. He paid or agreed to pay for each claim 25% of the amount due. The plan of having the claim assigned to the trustee was devised (according to the testimony of W. C. Warlick, the president of both corporations) in order to secure to the stockholders who had put up the $5,000.00, the rights of creditors against the Furniture Company. The principal reason for doing this (according to the witness) was to prevent the State Planters Bank, to which the Furniture Company owed $24,635.75 secured by a trust deed on real estate, after foreclosure, from undertaking to enforce an anticipated deficiency judgment "and thus destroy the new corporation." The witness estimated that the Furniture Company had from sixty-five to seventy creditors, and that only the plaintiff and one other creditor refused to settle at 25% of the face value of their respective claims.

On January 1, 1934, the Furniture Company transferred to the Furniture Store all of its assets, having an inventory value of $2,192.39 according to the Furniture Store, of $2,836.12 according to the plaintiff. (Neither party included the *accounts receivable* of the Furniture Company in the list of assets; yet the evidence refers to the collection of such accounts by the Furniture Store.) The sole consideration for the transfer (as testified to by Warlick) was the assumption by the Furniture Store of all the obligations of the Furniture Company "at the rate of twenty-five per cent of the original indebtedness." The sole purpose of the transaction (said the witness) was "to effect a compromise settlement of the debts of the Warlick Furniture Company on the basis of payment of twenty-five per cent." At the time of the transfer the Furniture Company was admittedly insolvent. No attempt was made to comply with the Bulk Sales Law.

The plaintiff secured its judgment against the Furniture Company in March, 1934, for $670.54. In April, $75.00 was paid by the Furniture Store on the judgment. No other payments being made, this proceeding followed, in which judgment was rendered in favor of plaintiff against the Furniture Store for 25% of plaintiff's claim less the $75.00 paid.

The total indebtedness of the Furniture Company was $66,678.31, and the Furniture Store takes the position that under the Bulk Sales Law, it is liable to plaintiff only for that per cent of its judgment which the value of the assets transferred to it ($2,192.39) bears to the total indebtedness, or 3.1%. *Emmons-Hawkins Co.* v. *Sizemore, supra,* and *Hagan-Ratcliff Co.* v. *Blake,* 109 W. Va. 73, 153 S. E. 252, are cited. The plaintiff answers that the ratio of payment proposed by the Furniture Store cannot be correct under any consideration, because $37,846.25 of the Furniture Company's total indebtedness was secured by deeds of trust on real property; that its lien attached to the assets of the Furniture Company in possession of the new corporation; that there are no prior liens against the Furniture Company; that the

value of the assets transferred to the Furniture Store exceeds the amount of its claim; and it is therefore entitled to be satisfied in full.

Since the officers and controlling interests are the same and the stockholders practically the same in both the Furniture Company and the Furniture Store, the abstraction of corporate identity will not be allowed to obscure the real situation. *Seymour* v. *Ass'n.*, 144 N. Y. 333, 340, 39 N. E. 365, 26 L. R. A. 859. That entity may be ignored, whether in law or equity, when the later corporation is organized to promote an unfair purpose. *Macfadden* v. *Jenkins*, 40 N. D. 422, 460, 169 N. W. 151; *Montgomery Co.* v. *Dienelt*, 133 Pa. 585, 597, 19 A. 428, 19 Am. St. Rep. 663; *Trachman* v. *Trugman*, 117 N. J. Eq. 167, 175 A. 147, 149; Cook on Corporations, (8th Ed.) sec. 663-4, page 2561. The trusteeship was devised to hinder State Planters Bank. The Furniture Store was organized as part of the plan to induce creditors of the Furniture Company to accept twenty-five per cent in payment of their claims. Actual fraud was seemingly not intended by the defendants or their counsel, but our statute defines such obstructions of creditors as fraudulent, irrespective of intent. The evidence discloses no payment for stock directly to the Furniture Store. The stockholders proposed by the mere change of one name in the corporate title (*Company* to *Store*) to improve their corporate position at the expense of the creditors. No such magic is wrought by simply changing the name of an enterprise. *Kellogg* v. *Bank*, 58 Kan. 43, 48 P. 587. The new corporation is in legal effect the old one under another name, and the legal status of the two is identical. *Matchan* v. *Phoenix Co.*, 159 Minn. 132, 198 N. W. 417; *Higgins* v. *California Co.*, 147 Cal. 363, 81 P. 1070, 1072. This doctrine is forcefully stated in Fletcher, Cyc. of Corporations (1917 Edition), sec. 44, as follows: "The doctrine of corporate entity is not permitted to stand in the way of defeating fraud. It follows that it is idle to promote a corporation for the purpose of endeavoring to accomplish fraud or other illegal acts under

the cloak of the corporate fiction. Where this is attempted, courts of law, equity or bankruptcy, do not hesitate to tear aside the veil of corporate entity and to look beyond it and through it at the actual and substantial beneficiaries. A notable instance is found in cases where it is sought to delay, hinder and defraud creditors. by means of 'dummy' incorporations. The courts have uniformly held that there is no magic in incorporation and refuse to apply the doctrine of corporate entity to enable such schemes to be successful." Accord: Anderson, Limitations of Corporate Entity, secs. 101 and 168.

Consequently, we are of opinion to regard the Furniture Store as but the *alter ego* of the Furniture Company. Under that view, there was no actual sale and the Bulk Sales Law does not apply. The assets of the Furniture Store are the assets of the Furniture Company and as such, are subject to the full satisfaction of plaintiff's lien. The judgment is accordingly

*Reversed and remanded.*