WILLIAM C. ATWATER & COMPANY, INC. *v.* FALL RIVER
POCAHONTAS COLLIERIES COMPANY *et al.*

(Nos. 8590, 8591)

Submitted October 12, 1937. Decided December 14, 1937.

*Crockett & Tutwiler* and *Henry S. Miller*, for appellants.

*Cocke, Hazlegrove & Shackelford, S. D. Stokes*, and *Strother, Herndon & Berry*, for appellees.

RILEY, JUDGE:

This suit in equity, brought by William C. Atwater & Company, Incorporated, against Fall River Pocahontas Collieries Company, Vaughan Coal & Coke Company and Bankers Pocahontas Coal Company, was appealed to this Court by Vaughan Coal & Coke Company (115 W. Va. 745, 178 S. E. 73), and remanded for further development. From a final decree, entered on the remand, Atwater Company and Fall River Company appeal.

A partial statement of facts, contained in the opinion of this Court rendered on the former hearing, reads:

"On May 1, 1901, Tug River Coal Land Company, predecessor in title to the defendant, Bankers Pocahontas Coal Company, leased to Cambridge Coal & Coke Company a tract of 808 acres of land in McDowell County for coal mining purposes. December 27, 1902, the Land Company entered into a new contract of lease with L. H. Vaughan who had acquired the rights of the Cambridge Company, providing for a royalty of eight cents per ton for coal mined and a minimum annual rental of $5,000.00 for a term of thirty years. On February 1, 1903, L. H. Vaughan assigned his rights under his lease to Vaughan Coal Company. The Vaughan Company operated the property until November 25, 1916, when it assigned its

rights therein to Fall River Pocahontas Collieries Company in consideration of the Fall River Company agreeing to pay the royalties under the lease to the lessor, the taxes on the land and seven cents per ton for all coal mined and a minimum annual royalty of $4,375.00 to the Vaughan Company. The Fall River Company, a subsidiary corporation of plaintiff, William C. Atwater & Company, Inc., was organized a short while before taking over the lease from the Vaughan Company, with a paid in capital of $90,000.00. The Fall River Company, during its operation under the lease, in April, 1926, distributed among its stockholders a 20% dividend, and in June, following, reduced its capital stock from $90,-000.00 to $30,000.00 and distributed the difference in cash to the stockholders. This left it without any working capital and necessitated the immediate and continued borrowing of money from the Atwater Company to keep it going. On November 26, 1927, the Fall River Company executed its note to the Atwater Company in the sum of $64,798.77 to cover previous loans. On January 3, 1928, the Fall River Company executed a chattel mortgage on all of its personal property to secure the payment of said note. On June 3, 1929, the Vaughan Company caused a distress warrant to be issued and levied upon the personal property of the Fall River Company for delinquent royalties due the former by the latter in the sum of $3,869.95. On June 10th, following, the Fall River Company notified the Bankers Company and Vaughan Company that it had permanently ceased the mining of coal from the premises because the minable coal therein had been exhausted."

The bill of complaint prays for an accounting, a temporary injunction against the distress proceeding, payment by Fall River Company of amount due under the chattel mortgage, sale of property covered by chattel mortgage, and general relief. To the bill of complaint, Bankers Company filed its answer and cross-bill, alleging damages to the premises by improper mining and abandonment of mining operations, and praying (1) that Atwater Company be enjoined from enforcing the chattel mortgage; (2) that Vaughan Company be en-

joined from enforcing the distress warrant; (3) that reference be made to a commissioner to ascertain liens, priorities, indebtedness of parties to each other, indebtedness of L. H. Vaughan, Vaughan Company and Fall River Company to Bankers Company for coal mined, coal not mined, minimum royalties, damages for abandonment and forfeiture of mining contracts; (4) that such sums found to be due Bankers Company be declared first liens on property of other defendants; (5) that a decretal judgment for any deficiency be granted to Bankers Company; (6) that performance of mining contracts be compelled; (7) for the appointment of a receiver; (8) that the rights of the parties be adjudicated; (9) that the mining contracts be set aside as clouds on Bankers Company's title; and (10) for affirmative relief.

To Bankers Company's answer and cross-bill, Fall River Company and Atwater Company filed separate answers, praying judgment in their favor on Bankers Company's cross-bill, except actual and minimum royalties due Bankers Company from January 1, 1929, to June 1, 1929, and taxes unpaid by Fall River Company. On March 26, 1930, Vaughan Company answered the bill of complaint and Bankers Company's answer, praying cancellation of all contracts prior to November 25, 1916, the date of assignment of lease by Vaughan Company to Fall River Company; that the lease of that date supersede all prior contracts; that Vaughan Company and Bankers Company be declared joint lessors of Fall River Company, and entitled to all rents jointly and without priority; that Vaughan be held not liable to Bankers Company for taxes; that Vaughan Company and Bankers Company be given prior liens on property of Fall River Company and the leasehold estate against Atwater Company; and general relief. An amended answer and cross-bill was filed by Vaughan Company alleging reduction of capital stock of Fall River Company in June, 1926, from $90,000.00 to $30,000.00, and praying that W. C. Atwater and C. B. Smith be made parties; that certain records of Fall River Company and Atwater Company be produced; that stockholders of Fall River Company be required to return the $60,000.00 derived from

the stock reduction and that same be applied to debts of Fall River Company; that the chattel mortgage be declared void; and general relief.

Fall River Company then answered the bill of complaint and amended answer and cross-bill of Vaughan Company, praying for judgment thereon in its favor and general relief. A like answer was filed by Atwater Company simply praying that the commissioner, to whom the cause theretofore had been referred, be required to report, and for general relief. C. B. Smith likewise answered praying to be dismissed and for general relief. Vaughan Company replied specially to these answers.

Such being the proceeding at the first hearing, the commissioner made his report, excepted to by Fall River Company. By decree, entered December 16, 1933, the court awarded judgment in favor of Bankers Company against Vaughan Company and Fall River Company for 1927-1932 taxes, amounting to $15,181.32; against Fall River Company in favor of Bankers Company, for actual and minimum royalties from December 1, 1928, to June 1, 1929, in the amount of $6,922.80, and in favor of Vaughan Company for like royalties in the amount of $6,057.45; against Fall River Company for minimum royalties to June 1, 1932, and in favor of Bankers Company, in the amount of $17,861.11, and in favor of Vaughan Company, in the amount of $15,640.32; and in favor of Atwater Company against Fall River Company, for the amount of the chattel mortgage as a lien subordinate to liens of Bankers Company and Vaughan Company. From this decree, the Vaughan Company alone took the first appeal.

On the first appeal, the case was remanded for further development on three issues: (1) Has all the minable coal been mined? (2) Did Fall River Company have a right to reduce its capital stock? (3) Is Atwater Company liable to Vaughan Company under the instrumentality rule?

On the remand, Atwater Company and Fall River Company filed answers to the answer and cross-bill of Vaughan Company, denying the right to apply the instrumentality rule, and by a second amended answer and

cross-bill, Vaughan Company sought to enforce the claim against stockholders of Fall River Company for the amount of the stock reduction. Atwater Company, Fall River Company, Vaughan Company and C. B. Smith's administrator excepted to the commissioner's second report. A decree was entered holding Atwater Company and Fall River Company jointly liable for debts of Fall River Company and awarding judgment in favor of Bankers Company against Atwater Company and Fall River Company for taxes paid by Bankers Company ($5,-711.39), and actual and minimum royalties from January 1, 1929, to June 1, 1932 ($25,711.29, with interest as installments accrued); and judgment in favor of Vaughan Company against Atwater Company and Fall River Company for actual and minimum royalties from January 1, 1929, to June 1, 1932 ($17,500.00, with interest on installments as they accrued); and ordering that the case be kept on the docket for enforcement of the liability of stockholders of Fall River Company for the stock reduction. From this decree, Atwater Company and Fall River Company prosecute this appeal.

In entering the final decree on the remand, the trial chancellor held (1) that all the minable coal had not been mined as of June 1, 1929, and the leases remained in effect until their regular termination on June 1, 1932; (2) that Fall River Company was unauthorized to reduce its capital stock in June, 1926; and (3) the instrumentality rule established liability against Atwater Company in favor of Bankers Company and Vaughan Company.

The first question is all-embracing. Was all the minable coal, as contemplated by the leases, mined as of June 1, 1929, the date of the attempted cancellation of the leases? If so, the obligation of Fall River Company and Atwater Company for taxes and royalties accruing after that time ceased. If, however, the coal was not exhausted, the liabilities, if any, under the leases and the action of the stockholders in reducing the capital stock of Fall River Company must be solved in answer of two questions: (1) Were the stockholders justified in said reduction of stock? and (2) Is the Atwater Company liable, under the instrumentality rule, to (a) Vaughan

Company, and (b) Bankers Company?

On the former appeal, one of the issues upon which this case was remanded was "whether or not there is any minable coal on the premises." Undoubtedly, the remand on this issue was based on the theory that the exhaustion of the minable coal would abrogate the leases, in which event the case would end in favor of Atwater Company and Fall River Company. In fact, under the former record, we can conceive of no other theory. That being so, this theory is the "law of the case" and is binding on this appeal. It is *res judicata*. *White* v. *Lazelle*, 99 W. Va. 109, 128 S. E. 303; *Pennington* v. *Gillaspie*, 66 W. Va. 643, 66 S. E. 1009; *Butler* v. *Thompson*, 52 W. Va. 311, 314, 43 S. E. 174; *Wick* v. *Dawson*, 48 W. Va. 469, 37 S. E. 639; *Seabright* v. *Seabright*, 33 W. Va. 152, 10 S. E. 265; *Henry* v. *Davis*, 13 W. Va. 230; 5 Corpus Juris Secundum, 1499, section 1964. It follows, therefore, that Vaughan Company's suggestion that the exhaustion of the minable coal is immaterial, under the lease, and Fall River Company's position that the leases contemplate only merchantable coal, have no place in this appeal.

On this appeal, however, it is pertinent to inquire "what is minable coal." The witness Osborne testified that "the strict definition of minable coal is any coal that can be mined, regardless of costs." Such a definition is narrow and arbitrary. Clearly, the words must be defined in view of the wording of the leases. These leases were before this Court on the first appeal. We note that the lease of Vaughan Company to Fall River Company contains a provision for an actual royalty of seven cents per each gross ton of "*merchantable* coal" and the original lease of December 27, 1902, between Tug River Coal Land Company, predecessor of Bankers Company, provides that, "if the lessee, upon abandoning any room, working or other opening, shall leave any available coal standing," which in the opinion of lessor's engineer is unnecessary, and upon notice lessee shall refuse to remove said coal, arbitrators shall be appointed to determine whether any, and if so, how much *available and merchantable coal* remains unmined which shall be paid for on the royalty basis provided by the lease. We

therefore cannot accept the witness Osborne's definition of "minable coal." These words, under the remand and within the terms of the leases mean coal which "could be profitably mined by judicious methods." *Auxier Coal Co.* v. *Big Sandy, etc., Coal Co.*, 194 Ky. 14, 238 S. W. 189, 191. In *Flavelle* v. *Red Jacket Consolidated Coal & Coke Co.*, 82 W. Va. 295, 96 S. E. 600, 605, where the terms of the lease required the lessee to mine all available, workable and merchantable coal, the court said: "Coal not available and not merchantable is not within the terms used to define what shall be mined." See also, *Big Vein Pocahontas Co.* v. *Browning*, 137 Va. 34, 120 S. E. 247, to the effect that "available coal" included all coal recoverable as a practicable and reasonable mining proposition, considering actual conditions, costs and all the surrounding circumstances, and that "merchantable coal" means coal which was ordinarily used, for sale, and could be usually sold at a profit, but did not mean coal which could be sold at a profit under all conditions. Several of the witnesses defined minable coal in like manner, most noticeably, J. L. Vaughan, an officer of Vaughan Company, who testified: "* * * mine operator would determine minable coal as coal that he could mine profitably."

In his second report, the commissioner found that there were 318,506 net tons, or 270,070 gross tons, of coal under the leasehold of the same kind and character as was mined from the mine from 1916 to 1929; "and that 80 per cent could be considered a fair and equitable recovery of said coal, thus leaving a net recoverable tonnage of 255,044 net tons, or 216,052 gross tons, of minable coal."

On the basis of the commissioner's finding, the trial chancellor, in the final decree, held that the liability for minimum royalties extended through the date of the attempted cancellation of the leases (June 1, 1929) until December 27, 1932 (the expiration date of the leases). Both the commissioner's report and the decree were based, to a large extent, upon the testimony of the witnesses Osborne for Bankers Company and Saunders for Fall River Company. In these two witnesses, both sides of the controversy were represented. The testimony of these two witnesses is to the effect that as of June 1,

1929, the date the operations under the lease ceased, there were on the leasehold 46,900 gross tons of stump and pillar coal in the main entry, and two areas of pillar coal containing, respectively, 112,860 tons and 142,746 tons. Under this testimony, there was a total tonnage of such coal in the amount of 302,506 gross tons, a tonnage slightly below that found by the commissioner. This coal, being pillar and stump coal, is necessarily the same as that mined by Fall River Company from November 25, 1916, the date the leases were assigned to the Vaughan Company, until June 1, 1929, the date mining operations were discontinued. There was other testimony to the effect that there remained on the leasehold an unmined tonnage of coal amounting to about two million tons. Under the record, the evidence is not sufficient to show that this gross tonnage was minable coal. However, the trial chancellor having found that the pillar and stump coal remaining unmined was the same which had been mined by Fall River Company and was minable coal, we are of the opinion that this finding is warranted by the evidence and that it cannot be disturbed on appeal. *Highland, Exr.* v. *Davis,* 119 W. Va. 501, 195 S. E. 604; *Spradling* v. *Spradling,* 118 W. Va. 308, 190 S. E. 537; *Wade* v. *Wade,* 115 W. Va. 132, 174 S. E. 787; *First National Bank* v. *McCloud,* 112 W. Va. 537, 540, 165 S. E. 799; *Davis* v. *Trust Company,* 107 W. Va. 141, 147 S. E. 490.

By its amended answer and cross-bill, the Vaughan Company raised the question of the right of Fall River Company to reduce its capital stock. The fact of such reduction did not come to the attention of either Vaughan Company or Bankers Company until the deposition of C. B. Smith was taken on May 29, 1930. Inasmuch as none of the stockholders of Fall River Company were served with process, this question is pertinent in the instant case only to the extent that it bears upon the exercise of control of Fall River Company by the Atwater Company and its majority stockholders. If the instrumentality rule was not involved, then under the present state of the record, this question would have no place herein.

Let us at this point consider the facts bearing on the

stock reduction. The checks whereby the $60,000.00 derived from the stock reduction was paid out were dated August 3, 1926. Evidently this payment so depleted the working capital of Fall River Company that without the assistance of Atwater Company, the mining operation would have ceased. In fact, in August, 1926, Atwater Company loaned to Fall River Company $8,127.19 to meet its then outstanding payroll and operating expenses over and above the amount received for its coal. And thereafter, from time to time, until May, 1929, various amounts were loaned by Atwater Company to meet the operating expenses of Fall River Company. During the first year after the reduction, Fall River Company lost $28,148.13, and beginning with 1924, until the closing of the mine, the company's losses increased until, in 1929, a net loss of $32,039.80 for that year was encountered. In addition, on April 30, 1926, a dividend of $20.00 per share or $18,000.00 was paid to the stockholders of Fall River Company. Evidently Fall River Company was not in a prosperous condition at the time these payments were made, and the payments were made in the face of a depressed and declining coal market, and with a future liability annually to accrue under the leases for taxes, and minimum annual royalties in the amounts of $5,-000.00 and $4,375.00 to Bankers Company and Vaughan Company, respectively. Clearly these payments to the stockholders of Fall River Company could not have been made were it not for the active participation of William C. Atwater, the president of both companies and the directors of Fall River Company which constituted the entire directorate of Atwater Company. This reduction of the capital stock and payment of the dividend in 1926 constitute one of the vital elements showing the exercise of the control of Fall River Company by Atwater Company and its officers and directors for the benefit of Atwater Company and its stockholders to the detriment of Vaughan Company and Bankers Company. This detriment did not appear at the time the payments were made. Nevertheless, they so vitally depleted the capital of Fall River Company that it then and there ceased of itself to be a going concern, and loans made from time to time

by Atwater Company to keep the mining operations going in no sense constituted, as appellants' counsel say, virtually a return of the amount paid out, because in this very suit, Atwater Company seeks to enforce a chattel mortgage on the equipment of Fall River Company as security for the repayment of these amounts.

Both Bankers Company and Vaughan Company invoke the instrumentality rule; first as a defense measure against the enforcement of the chattel mortgage, and second, affirmatively, to hold Atwater Company for the debts of Fall River Company, including the latter's obligations under the leases. They say that Fall River Company is simply the instrumentality of Atwater Company, and therefore, Atwater Company, as against the lessor, could not enforce its mortgage against Fall River Company, and would be liable for the debts of Fall River Company. On this question, the commissioner found that the instrumentality rule was properly invoked, and on the basis of this finding, the chancellor decreed that Atwater Company and Fall River Company were jointly liable to Vaughan Company and Bankers Company for their respective claims for royalties, accrued and minimum, and to Bankers Company for taxes paid by it.

The instrumentality rule is a modern innovation in the law of corporations. It came into being as a result of a gradual growth, brought about by the necessities of situations which confronted the courts. The development of the law on this question is still in progress, and therefore, courts should invoke the rule only with mature consideration and caution. Undue haste in the application of the rule to every case involving corporations would break down the entire corporation law of the country and would bring about disastrous results. In determining the application of the rule, the test is the exercise of control by the parent company over the subsidiary company, and not the mere opportunity to exercise control. Of course, factually in every case the exercise of the control must be viewed in the light of the opportunity to control.

Let us for a moment consider the elements relied upon by Vaughan Company and Bankers Company in support

of their position that the Fall River Company was simply the instrumentality of Atwater Company. In the first place, Fall River Company was organized through the promotion of John L. Steinbugler, the secretary and general counsel of Atwater Company. Its organization was prompted by a desire to mine the coal under the leases in question and make the coal available for sale by the Atwater Company, which, during the whole course of the transactions, engaged in the business of selling the coal mined by Fall River Company and other companies operating in the Pocahontas field. From the very beginning of the existence of Fall River Company, Atwater Company sold all of the coal mined by it and received a commission of 5% of gross sales plus five cents per ton. To a large extent, the opportunity to control lay in the corporate setup of the two companies. In fact, 84.44% of the capital stock of Fall River Company was owned by Atwater Company's stockholders, and 79.67% of the capital stock of Atwater Company was held by Fall River Company's stockholders. Atwater Company's president, treasurer, and secretary were, respectively, president, vice-president and secretary of Fall River Company, and the auditor of Atwater Company was the treasurer of Fall River Company. Three of the five directors of Fall River Company constituted the entire directorate of Atwater Company. The auditor of Atwater Company and the general manager of Fall River Company constituted the two remaining directors of Fall River Company. Both companies jointly occupied the same offices in New York where a good part of Fall River Company's records were kept.

The foregoing facts undoubtedly show that Atwater Company and its stockholders had the opportunity to control the business and destinies of Fall River Company. These facts, however, do not, of themselves, constitute the Fall River Company the instrumentality of Atwater Company. The mere fact that two companies have the same officers and directors does not of itself justify the invocation of the instrumentality rule. Such a situation is commonplace in everyday business life. Time and again, courts have held that a corporation is

an entity distinct from its stockholders. See notes, 1 A. L. R. 610, and 34 A. L. R. 597; *Ulmer* v. *Lime Rock R. Co.*, 98 Me. 579, 57 Atl. 1001; *Fietsam, Assignee* v. *Hay*, 122 Ill. 293, 13 N. E. 501; 43 West Virginia Law Quarterly, 141. Equally, it is a general rule that the fact that the majority of the stock of one corporation is owned by another corporation does not make the former the instrumentality of the latter. *Centmont Corporation* v. *Marsch*, 68 Fed. (2d) 460; *State ex rel. Daniel* v. *Broad River-Power Co.*, 157 S. C. 1, 153 S. E. 537.

In this jurisdiction, the rule is well established that the corporate entity cannot be disregarded haphazardly. *Moore* v. *Schoppert*, 22 W. Va. 282. However, the instrumentality rule has been invoked in this jurisdiction in two recent cases. *Southern Co-op Foundry Co.* v. *Warlick Furniture Co.*, 117 W. Va. 336, 185 S. E. 773; *Tynes* v. *Shore*, 117 W. Va. 355, 185 S. E. 845. And, generally, without exception, the corporate veil will be torn away wherever the occasion makes it necessary to prevent a fraud or a wrong. *Southern Co-op. Foundry Co.* v. *Warlick Furniture Co., supra; Brundred* v. *Rice*, 49 Ohio State 640, 32 N. E. 169, 34 Am. St. Rep. 589; *First National Bank of Chicago* v. *F. C. Trebein Co.*, 59 Ohio State 316, 52 N. E. 834; *United States* v. *Milwaukee Refrigerator Transit Co.*, 142 Fed. 247, 255; *Minifie* v. *Rowley*, 187 Cal. 481, 202 Pac. 673. See generally, Powell, Parent and Subsidiary Corporations, Chapters III and IV. Also *Majestic Co.* v. *Orpheum Circuit*, 21 Fed. (2d) 720, 724, 725, for collation of authorities.

We must analyze the record to ascertain what was done by Atwater Company, its stockholders and officers which would tend to show that Atwater Company was, during the course of the transactions involved in this suit, actually engaged in the business of controlling Fall River Company. Upon analysis, the record discloses the following facts: On October 6, 1921, by resolution adopted at the annual stockholders' meeting of Fall River Company, Atwater Company borrowed on open account, without security, the surplus funds of Fall River Company, payable on demand; in two separate transactions, one involving $65,000.00 and the other

$102,400.00, Atwater Company, through William C. Atwater, sold to Fall River Company stock in coal mining companies owned by Atwater Company, with the option of Atwater Company to repurchase the same.

There are other elements which we deem of minor importance. For instance, the advancement by Atwater Company to Fall River Company, from August, 1926, to May, 1929, of money necessary to operate the mine, the necessity being occasioned by the reduction of the capital stock of Fall River Company; the filing of consolidated federal tax returns for both companies and three other mining companies controlled by Atwater Company; and the payment of the outstanding accounts of Fall River Company, except royalties, taxes and officers' salaries, when Fall River Company ceased doing business on June 1, 1929.

We find Fall River Company subject to the will and control of Atwater Company, its officers and majority stockholders. The exercise of that control was for the benefit of Atwater Company and its stockholders. Not only was Fall River Company used for the purchase of stock for the benefit of Atwater Company; but there are two other distinct instances of the exercise of control, both of which inured to the benefit of Atwater Company and its majority stockholders and worked to the detriment of Fall River Company's creditors, including Vaughan Company and Bankers Company: (1) In June, 1926, while a great majority of Fall River stock was held by stockholders of Atwater Company who had controlling interest therein, the capital stock of Fall River Company was reduced from $90,000.00 to $30,000.00 and the amount of the reduction distributed to the stockholders. This was done in the face of Fall River Company's outstanding obligations to Vaughan Company and Bankers Company, under the mining leases, a depressed and declining coal market, and a doubtful financial condition of Fall River Company. By this action, Fall River Company became disabled on the basis of its own capital from carrying out the provisions of the mining leases. True, from time to time after the reduction of the stock, Atwater Company advanced various sums of money to

Fall River Company for the purpose of maintaining its operations. These advancements were not a return of the capital of Fall River Company, but were loans eventually secured by the chattel mortgage executed by Fall River Company to Atwater Company and the very execution of this mortgage constitutes the second outstanding indicium of the exercise of control by Atwater Company of Fall River Company for the benefit of the former, the assertion of which as a lien prior to the claims of Vaughan Company and Bankers Company was a distinct detriment to those two companies.

Equitable estoppel is interposed by Atwater Company as a bar to the application of the instrumentality rule. Atwater Company contends that both Vaughan Company and Bankers Company knew, when the agreement of April 25, 1916, was executed, that, although they were dealing with William C. Atwater, a new corporation would be organized to operate the property; that Atwater Company did not intend to obligate itself by any contract for the purchase or leasing of the properties; and that the interests of William C. Atwater in both companies must have been a matter of knowledge to the Vaughan Company and Bankers Company. The facts of this knowledge are immaterial so far as the question of estoppel is concerned. As said before, the mere opportunity to control is not sufficient to invoke the instrumentality doctrine. It was the exercise of control of Fall River Company by Atwater Company which prompts us to the position that the instrumentality rule was properly invoked. This, however, did not come to the attention of Vaughan Company or Bankers Company until the cross-examination of appellants' witnesses, and nothing in the record would seem to indicate that the appellee companies, or their representatives, had any means to discover the inside transactions of control between Atwater Company and Fall River Company. In the absence of such knowledge or means of knowledge, there can be no equitable estoppel. *First National Bank* v. *Croy,* 108 W. Va. 342, 150 S. E. 904; *Norfolk & W. R. Co.* v. *Perdue,* 40 W. Va. 442, 454, 21 S. E. 755; *Atkinson* v. *Plum,* 50 W. Va. 104, 40 S. E. 587, 58 L. R. A. 788; *Bett-*

*man* v. *Harness,* 42 W. Va. 433, 26 S. E. 271, 36 L. R. A. 566; *Morgan* v. *Chicago & A. Railroad Co.,* 96 U. S. 716, 24 L. Ed. 743.

The appellants raise the question that neither Vaughan Company nor Bankers Company can obtain affirmative relief against Atwater Company on the basis of the instrumentality rule for the reason that the pleadings do not justify such relief. The amended answer and cross-bill of Vaughan Company, to which no demurrer was filed, states with sufficient particularity the control of Fall River Company by Atwater Company to justify the trial chancellor applying the instrumentality rule in favor of Vaughan Company. True, this pleading does not pray specially for such relief, but the relief can be obtained under the general prayer. *Vance Shoe Co.* v. *Haught,* 41 W. Va. 275, 23 S. E. 553.

The situation is entirely different as to Bankers Company. At no place in the record did Bankers Company make any allegations upon which the instrumentality rule could be predicated and the prayer for general relief contained in its answer and cross-bill will not take the place of such allegations. Relief can only be obtained under a general prayer where there are supporting allegations and the relief sought is not inconsistent with the special relief prayed for. *Selvy* v. *Selvy,* 115 W. Va. 338, 344, 177 S. E. 437; *Kesterson* v. *Brown,* 94 W. Va. 447, 452, 119 S. E. 677; *Waldron* v. *Harvey,* 54 W. Va. 608, 46 S. E. 603, 102 Am. St. Rep. 959; *Vance Shoe Co.* v. *Haught, supra.* Under these circumstances, Bankers Company cannot, as the record now stands, obtain any relief against Atwater Company. However, Bankers Company should be given an opportunity to amend.

No decree was had against the stockholders of Fall River Company, and they were not served with process in the circuit court or in this court. None of said stockholders, except C. B. Smith, filed an answer in this cause, and Smith was not made a party to the cross-bill of Bankers Company, which is the company objecting to the non-entry of a decree against his personal representative, he having died *pendente lite.* Under these circumstances, the statement in the decree of the circuit court

as to the liability of these stockholders is a mere gratuity.

For the foregoing reasons, we affirm the decree as to Vaughan Company, and reverse it as to Bankers Company and remand this case with leave to Bankers Company to amend its pleadings if so advised.

*Affirmed in part; reversed in part; remanded.*