# CHARLESTON.

WORTHINGTON v. COLLINS'S ADM'R *et al.*

Submitted January 25, 1894.—Decided April 11, 1894.

1. RESCISSION.

 Where an agreement is rescinded, the general rule is, that it must be rescinded entirely, and the parties be placed as near as may be *in statu quo*.

2. RESCISSION.

 Where the rescission is made on account of the vendor's default the general rule is, that the vendee is entitled to have the purchase-money paid by him with its interest returned, also to be paid for permanent improvements made in good faith; but he is to be charged with the reasonable rents and profits after deducting the amount paid for taxes, and is also to be charged for any waste by him committed.

3. RESCISSION.

 A case in which these principles are applied. Sequel to *Worthington* v. *Staunton*, 16 W. Va. 208.

W. S. LAIDLEY and GEO. S. COUCH, for appellant cited 16 W. Va. 228; 2 Warv. Vend. & Pur. 878; 3 Leigh 113; 11 Gratt. 468; 25 Am. Dec. 155; 12 Am. Dec. 453.

MOLLOHAN & MCCLINTIC and GEO. E. PRICE, for appellees.

HOLT, JUDGE:

This is the sequal of the case of *Worthington* v. *Staunton,* 16 W. Va. 208, decided in 1880, by which the contract of sale and deed of conveyance of certain real estate in Kanawha county, made by Worthington and others to R. H. Collins, was cancelled and annulled; as were the notes and bonds executed by Collins for the balance of the purchase-money; and the cause was remanded to the Circuit Court of Kanawha county with instructions to place the vendee, Collins, and his vendors and grantors, Worthington and others, *in statu quo* and to take such account or accounts as might be necessary for that purpose, according to the rules and principles of courts of equity in cases of the rescinding of contracts, and further to proceed with the cause according to the principles settled in the opinion of the court and according to the principles and rules governing courts of equity. The cause came back, this mandate was entered, and, the death of Richard H. Collins having been suggested, the cause was revived as to such defendant in the name of Roman Pickens, sheriff of Kanawha county and as such administrator of the personal estate of the decedent, R. H. Collins; and the Circuit Court referred the cause to Commissioner D. C. Gallaher, to take the accounts directed to be taken; but he having resigned leaving the orders unexecuted, on December 16, 1890, the cause was referred to Commissioner Fontaine, to act in the place of Commissioner Gallaher, and he was ordered and directed to take and report such accounts as had been ordered by this Court to be taken, in order to place vendee and vendor *in statu quo* in reference to the contract of sale which had been rescinded.

On the 3d day of December, 1892, the commissioner returned, and filed his report, together with the testimony taken and written evidence read by him touching the matters referred, in which he gives a full history of the case in both branches, as far as here involved, and gives as the conclusion to which he has been brought, that the only thing now to be done in the case to place defendant R. H. Collins and his grantors, Worthington and others, *in statu quo*

is to require Henry Worthington to repay the administrator of the estate of Collins the money, which was paid by Collins on account of the purchase with interest from the date of payment, *viz.*, two thousand dollars with interest from the 1st day of April, 1858, to December 1, 1892, making a total on that day of six thousand one hundred and sixty dollars. To this report Henry Worthington excepted, but the Circuit Court on final hearing of the cause on the 11th day of February, 1893, overruled the exceptions and gave a decree in favor of Collins's administrator against Worthington for the sum of six thousand one hundred and eighty three dollars and thirty three cents, that being the aggregate of principal and interest to that date. From this decree, Henry Worthington obtained this appeal.

The ground of complaint is that he conveyed the land to Collins, full of cannel coal, and covered with its virgin forest of valuable timber, but, when the deed was rescinded, the land was returned to him without its coal, stripped of the timber and otherwise comparatively worthless; and while to return to Collins the purchase money with its interest, would put him in *statu quo*, it would not put Worthington where he stood before the sale. This presents the question—the only one now involved :—Did Collins, while vendee under the rescinded contract, take coal or timber or in any way receive any rents, issues or profits from the land ; or did any one commit such waste or secure such profits, for which Collins ought in equity to be held responsible to Worthington, the vendor ?

To this question the commissioner makes answer that Collins is not chargeable with any of these things. The land was in a state of nature, and so remained until the contract of sale to Collins was rescinded, except the one hundred acres sold by Collins to Staunton. That a considerable amount of cannel coal and timber was taken off the one hundred acre-tract by Staunton, and a considerable amount of timber from the residue of the tract by Staunton, but neither coal nor timber was ever taken off either tract by Collins, or by any one for him ; or that Collins ever received any benefit from coal or timber thus taken, or is in any way responsible therefor. The inducement to

Collins to buy the undivided half of that half lying south of the red line was the cannel coal, and the inducement to Staunton to buy the one hundred acres was the cannel coal. But it turned out that the Work & Curran lot had not been partitioned by the red line—had not been partitioned at all; and that, when it was partitioned, Collins did not get the land he bought, nor Staunton all of the one hundred acres he bought, and this put it out of the power of Worthington and others to fullfill their contract of sale to Collins, and that contract was rescinded; therefore it was not in power of Collins to fulfill his contract of sale to Staunton, nor could Worthington, who had guarantied it, fullfill it.

The written agreement of September 5, 1859, contained the following covenant:

"That the said party of the first part, for and in consideration of the sum of five thousand dollars, hereinafter agreed to be paid by the said party of the second part to him, the said party of the first part, his executors, administrators, or assigns, as follows:  Two thousand dollars on the 1st day of February next, two thousand dollars on the 1st day of August next, and the remaining sum of one thousand dollars on the 1st day of November, eighteen hundred and sixty, each with interest from this date, at the rate of six *per cent. per annum*—hath granted, bargained and sold, and by these presents doth grant, bargain, and sell to the said party of the second part, the following piece or parcel of land, known and described as follows in and on the report and map of survey made in August, 1859, by John L. Cole, surveyor of Kanawha county: 'Beginning at a stake at A on Mill creek, in Kanawha county, Virginia, twenty poles above the mouth of the old cannel-coal entry, said stake being corner to Finnell & Co.'s (*i. e.* Kanawha Cannel Coal Mining and Oil Manufacturing Company's) land, or lot A on said Cole's map, and running with the line of same, south, thirty seven degrees east, to such point as, with the following boundaries and lines, shall embrace and include one hundred acres; thence north forty five degrees east, parallel with the main right line of lot No. 2 of the Work & Curran survey, to the right-hand fork of Mill creek; thence down said fork and down Mill creek,

with their meanderings, and with the line surveyed by Young Matthews in December, 1858, to the place of beginning at A.' Said parcel of land is part of lot No. 2 of the Work & Curran 30,000-acre tract, and included in the undivided interest conveyed by Henry Worthington and others to the party of the first part by deed dated April 19, 1859, and recorded August 10, 1859, in book W, in the Kanawha county court clerk's office. For more full and perfect description and boundary, reference is made to the said several surveys and the reports and maps thereof. And the said party of the first part, for himself, his heirs, executors, and administrators, doth hereby covenant and agree to and with the said party of the second part to make to him, upon tender of payment of the first instalment of two thousand dollars, with interest, on said 1st day of February next, a good and sufficient deed of said premises, with covenant of warranty, and free from all liens and incumbrances of any kind whatsoever, reserving to himself a lien upon said premises for the remaining sum of three thousand dollars of said purchase-money, and interest payable at the times and in the manner above specified. And the said party of the second part, for himself, his heirs, executors, administrators, and assigns, does hereby covenant and agree well and truly to pay to the said party of the first part the moneys agreed to be paid, at the times and in the manner above specified, and also to pay any and all taxes and assessments imposed upon said premises since the 13th day of May last; provided, and it is understood and agreed between the parties hereto, that the party of the second part is neither bound nor expected to pay any part of said purchase-money until any and all liens and incumbrances which may rest against said premises are satisfied and removed, and the above-mentioned deed, with covenant of warranty made and executed ready for delivery; and, also, whenever any payment of principal or interest may be due of the above-mentioned purchase-money, the said party of the second part shall have the right to pay to any person or persons holding or owning any adjusted and legal lien or incumbrance affecting the title to said premises, and such payment or payments shall be in satisfaction to the amounts of the money so paid

of the payments to be made hereon.  And, furthermore, it is expressly agreed and understood by and between the parties hereto that if, from any cause, the party of the first part shall fail, neglect or refuse to perfect the title to, and remove all liens and incumbrances from said premises and make said warranty deed to said party of the second part at the time and in the manner above specified, the measure of damages in any action brought for such failure by the said party of the second part against said party of the first part for such failure shall be the full amount of the purchase-money he shall have paid thereon, if any, the full value of any and all improvements put upon said premises by said party of the second part, and a reasonable compensation for the damages resulting to him, the said party of the second part, in the destruction of his business in consequence of such failure, less the reasonable value of the coal used during the occupancy of the party of the second part. In witness whereof the parties hereto have hereunto set their hands, and affixed their seals, this 5th day of September, one thousand eight hundred and fifty nine.

"RICHARD H. COLLINS,     [Seal.]

"J. G. STAUNTON.          [Seal.]

"Witnesses :   J. M. STAUNTON,

"WM. H. DAVENPORT."

By reason of Collins's breach of the said warranty to Staunton the latter obtained against Collins a judgment for forty five thousand dollars.  After allowing for the reasonable value of five thousand tons of coal, a liberal allowance for what was taken, Worthington was liable to Collins for this damage.  He expressly recognized such liability, and executed a guaranty of Collins's agreement, so that if five thousand tons of coal were taken from the land, which came back to Worthington, it was taken to pay and was *pro tanto* applied in payment of Worthington's debt—one that he was ultimately bound for as between him and Collins; and this Worthington recognized by settling and taking from Staunton an assignment without recourse of the judgment against Collins.  The contract between Collins and Staunton treated the timber on the one hundred-acre tract, and the taking of the timber, as an incident of Staunton's op-

eration—as an accessory of the mining of the coal and the extraction of the oil; at any rate, whatever the reasons, it was not to be considered and accounted for by Staunton in the contingency provided for, and this mode of adjustment and settlement was expressly sanctioned by Worthington. The timber, which Staunton took off the rest of the Collins tract, was taken under or by color of tax-deeds or titles which Staunton had, which turned out to be invalid. No matter how taken, it was a taking with which Collins had nothing whatever to do; and for such trespass, if any, also for any waste of any kind on the one hundred acres, Worthington released Staunton, so that Collins can not hold Staunton liable for it, he having already paid Worthington therefor—the party ultimately entitled on the rescission of the Collins contract. So that, as to all these things, Worthington has already been put as nearly in *statu quo* as is now possible. Staunton, for the benefit of Collins, has given Worthington credit for the five thousand tons of coal, on the damages for which Worthington was ultimately bound as between him and Collins; and for himself and for Collins, as far as Collins was liable therefor, has settled and accounted with Worthington for all the other damage or waste or trespass committed by him on the one hundred acres or on the residue. For it is conceded, or must be conceded that Collins himself did none of these things, and could only be made liable at all as one bound for the tort and damage of his tenant by incomplete purchase, Staunton, who would in such event have been bound therefor to him; and now to allow Worthington to set it off in reduction of Collins's purchase-money, in his hands to be returned would be giving him the benefit of it twice. This would not be according to the principles applied by courts of equity in rescinding contracts.

The origin of the trouble in this case, calling for rescission, was the fact, that the Work & Curran lot No. 2 of three thousand five hundred and eighty three acres, had never been effectively partitioned by what is called the "Red Line;" and that on suit for partition, brought after the sale to Worthington and others, it was found that it could not be thus divided with due regard to the rights of the

other co-owners. So that by the partition, which on trial was found necessary, and which was made and by the court affirmed without final objection, three hundred acres of the land sold to Worthington and by Worthington to Collins fell north of the "Red Line;" whereas the part supposed to contain the body of the cannel coal, which induced the purchase lies south of the "Red Line." This made the case for rescinding the contract on the prayer of Collins, the purchaser, as decreed by the Court in *Worthington* v. *Staunton*, 16 W. Va. 208, the cancellation of the deed of conveyance made to Collins, and the sending the cause back to the Circuit Court to place the parties *in statu quo*. This must be done as near as may be, and generally requires the recission *in toto* of an entire contract. *Glassell* v. *Thomas*, 3 Leigh, 113. This created the necessity for Collins to restore to Worthington the one hundred acres that Collins by contract of September 5, 1859, had sold to Staunton. This contract of sale contained the covenants and agreements copied in *Worthington* v. *Staunton* (1880) 16 W. Va. 208, 222. By contract dated September 6, 1859, Worthington and others, after reciting the above contract to Staunton, approved, ratified, confirmed and guaranteed said contract in all its terms, and agreed to protect Collins against any loss, cost or damage, which he might suffer in consequence of their failure to make said title good. See 16 W. Va. p. 211, where it is set out. Staunton then went into possession of the one hundred acres and erected and put into operation his cannel-coal oil-works at a cost of more than fifty thousand dollars. After the partition, Staunton virtually renounced his purchase and sued Collins at law, obtaining a judgment for forty five thousand dollars, after allowing and deducting the reasonable value of five thousand tons of coal the full amount taken by Staunton during his occupancy. Worthington evidently recognizing his liability for this judgment for damages against Collins by contract of March 4, 1886, took an assignment from Staunton of any and all claims for damages that Staunton had against Collins arising out of the contract of purchase from Collins of the tract of one hundred acres, over and above any claim that Collins might have

against Staunton arising out of said conntract for coal mined and timber cut or for use and occupation by Staunton, and Staunton released Worthington from all liability for damages Staunton might have by reason of the contract of confirmation and guaranty, and Worthington released Staunton from all other claims and demands of every kind, and Staunton was to buy in the whole tract of eight hundred and seventy five acres at a price sufficient to pay the decree then against it, which was done at something over five thousand dollars. Staunton thereby becoming the owner of the whole Worthington or Collins tract of eight hundred and seventy five acres, as it had been partitioned.

But for this compromise and adjustment between these parties, the duty imposed on Collins of placing Worthington *in statu quo* as to the one hundred acres might have been embarrassing and difficult; and this practical difficulty of placing the parties *in statu quo* is one of the grounds of the reluctance of courts of equity to rescind executed contracts, also to take away the temptation for making a case for rescission after a change of circumstances may have made it desirable. In this case the hardship fell to some extent upon all the parties, and grew out of the fact that the discovery and use of petroleum destroyed the business of making oil out of cannel-coal, and, for an indefinite time at least, greatly impaired the value of cannel-coal land. The court rescinded this contract on account of the default or inability to make title of Worthington, the vendor; so that Collins would be entitled to have the purchase-money paid by him with its interest returned. In this case he is not entitled to anything for permanent improvements, if any, made in good faith by Staunton, his tenant by contract, by incomplete purchase, for Worthington has already settled and accounted for them with Staunton, the party who made them, and who would have been ultimately entitled to be paid therefor, and, at the same time and in the same way, Staunton settled and accounted with Worthington for the rents and profits and the waste, if any, that was committed by him, and Worthington released Staunton from all liability there might be against him by

reason thereof. And Worthington could not enforce against Collins any right or claim to damages that Staunton might have had against Collins by reason of having taken from Staunton an assignment of such claim; for he had expressly contracted and agreed to protect Collins against any such loss or damage, and rescission could not render this contract nugatory, for the effect of rescission was one of the contingencies contemplated and provided for. Affirmed.