EMILE C. DESTUBNER *v.* MICROID PROCESS, INC., *et al.*

(No. 9288)

Submitted May 12, 1942.  Decided July 1, 1942.

Fox, PRESIDENT, dissenting in part, concurring in part.

*Rummel, Blagg & Stone,* for appellants:
*Davis & Painter,* for respondent.

RILEY, JUDGE:

The defendants, Microid Process, Inc., a West Virginia Corporation, and United Carbon Company, Inc., a Maryland corporation, appeal from the decree of the Circuit Court of Kanawha County rendered in the suit in equity in which Emile C. deStubner was plaintiff and the above-named corporations and United Carbon Company, a Delaware corporation, defendants. For convenience the defendants, in the order named, will be hereinafter referred to as "Microid," "United, Inc.," and "United Carbon Company."

The decree complained of cancelled an exclusive and non-assignable license and right to sub-license from plaintiff to Microid under plaintiff's patents, relating to the manufacture and processes for the manufacture of pigments, both black and colored, and a concomitant agree-

ment contemporaneously executed between Microid and United, Inc., providing for an exclusive license as to the field of black pigments only, and decreed the recapture by plaintiff of his patent process and invention. It also denied any relief against United Carbon Company.

When this case was here on certification, *deStubner* v. *Microid Process,* 121 W. Va. 773, 6 S. E. (2d) 777, the rulings of the circuit court were affirmed in overruling defendants' demurrers to the bill of complaint. On the certification, it was held, *inter alia,* that the agreements, together with an agreement between plaintiff and United, Inc., all dated July 31, 1936, interlocked; that the covenants therein were dependent; that the consideration underlying them was an implied covenant that plaintiff's inventions would be exploited in both fields of endeavor; and that the failure to use a reasonable effort to exploit the inventions in the field of color pigments will render the agreements voidable, and subject to rescission in a court of equity.

After a series of negotiations, plaintiff and United Carbon Company entered into an agreement, dated May 1, 1934, whereby the latter was given an option for one year to secure for its benefit the exclusive license to use, with the exclusive license to sub-license, certain listed patents, inventions, and processes for the full term of any and all of such letters patent, less five days. This agreement provided for the formation of a holding company with a specified corporate setup, in the event the option should be exercised, and that during the option period plaintiff should demonstrate to the United Carbon Company, at the latter's expense, the commercial possibilities of the processes embraced in plaintiff's inventions and the products thereof. Shortly thereafter United Carbon Company established and equipped in Charleston a laboratory with plaintiff in charge, known as the "Bullitt Street Laboratory." Before the expiration of the option period, United, Inc., in which United Carbon Company held all of the stock, was formed, for the purpose of owning and operating all of United Carbon Company's carbon black

properties, and became assignee of that corporation's rights under the option agreement. The option period was extended to August 1, 1936. Before the expiration of the last period, United, Inc., exercised the option, and the three contracts, dated July 31, 1936, were made: (1) Plaintiff with United, Inc., (2) plaintiff with Microid, and (3) Microid with United, Inc. The outline of these agreements contained in the opinion rendered when this case was here before, for convenience will be repeated here:

"The agreement between plaintiff and United, Inc., recites the succession of that corporation to United Carbon Company's rights; the exercise of the option by United, Inc., subject to certain modifications; the organization of Microid with 9,000 shares of common stock, without par value, divided into 'A' and 'B' classes, ownership in Microid, by agreement of even date between plaintiff and Microid, of the exclusive license to use, with exclusive right to sub-license, plaintiff's inventions, as disclosed in patents and patent applications listed in the option of May 1, 1934. This agreement provides, among other things, that the first $12,000.00 of dividends shall be paid to the holder (deStubner under his agreement with Microid) of Class 'A' stock; that the expense of prosecuting plaintiff's patent applications shall be borne by Microid; that the board of directors by a majority vote shall determine the extent of expenditures; that so long as United, Inc., retains right to use the license of even date, from Microid to United, Inc., it shall advance funds, should Microid not have same available, to pay taxes, including those necessary to maintain the corporate existence of the corporation, and such expenses as Microid shall have incurred by its board of directors; said deficiency to be covered by notes of Microid; that this agreement and the license agreements of even date between plaintiff and Microid and Microid and United, Inc., are accepted as full and complete performance of the original option agreement, and in so far as there may be any difference, this agreement and those of even date shall prevail; that the agreement be spread upon corporate records of Microid and become a part of its record.

"By agreement between plaintiff and Microid, the former granted to the latter a 'non-assignable * * * sole and exclusive license to use, together with the sole and exclusive right to sub-license the use of' a number of existing patents and inventions, and those to be subsequently developed or discovered, pertinent or valuable to the science and art of pigment dispersions, and Microid agreed to defend such rights against infringement. The agreement further provided that in consideration of 3,000 shares of Microid stock delivered to plaintiff, the latter would be employed as director of technical research for a period of five years, at no salary, subject to his right to terminate such employment if annual dividends on Class 'A' stock did not amount to $12,000.00, or unless someone (presumably United, Inc.,) made up the deficiency; that all patents produced as result of such research would inure to the benefit of Microid; that the license granted by such contract could be terminated (1) by adjudication of bankruptcy or insolvency of licensee; or (2) if dividends on 'A' stock, plus such funds as may be paid the holder, did not equal the sum of $12,000.00; that termination under the latter required sixty days' notice; that upon termination for either cause, all licenses theretofore lawfully granted by Microid would remain in full force and effect, except that the royalties or license fees reserved to Microid under terms of each license granted should thereupon revert to and become the property of plaintiff; that all rights of Microid under said license would revert to and become the property of deStubner, in event of termination of the agreement; and that licenses by Microid to others than the United, Inc., were to be in accordance with the form attached to its license.

"In the last of the three agreements, Microid granted United, Inc., an exclusive license to use and to sub-license others to use, any and all patents and inventions owned by Microid or under which Microid has a right to grant such license, for the treatment of carbon black or other pigments produced by the combustion or decomposition of hydrocarbon gases, petroleum or petroleum products

and lamp black, under all the inventions and discoveries, whether patented or unpatented, relating to such use, and including the patents and inventions more particularly set forth in the schedule of patents, applications and inventions attached thereto. It also provided for cancellation in event of breach, default or failure to perform any of the terms and conditions thereof; made plaintiff Microid's agent in event of conflict of interest between United, Inc., and Microid; and that upon the termination of the agreement with Microid, plaintiff was to receive one-third of the royalties."

The license reserved to Microid the right to give a non-exclusive license to Colloidal Pigment Company, a corporation organized for the manufacture and sale within the United States of water dispersions of carbon black in pulp form under specified patents and patent applications, which corporation was later dissolved, at deStubner's suggestion, after incurring a net loss of $46,644.21.

As can be seen from the former opinion, plaintiff sought cancellation of the agreements on four grounds: (1) Breach of the alleged implied duty to exploit plaintiff's inventions; (2) failure of consideration; (3) fraud in that (a) United Carbon and United, Inc., falsely represented that they had adequate technical staffs and trained organizations which could be used to exploit plaintiff's inventions, and (b) said defendants, though then entertaining an intention not to perform, represented to plaintiff that his inventions would be exploited in both fields of endeavor; and (4) Microid's insolvency. Grounds (1) and (2) need not be discussed separately. In passing, it seems appropriate to state that, as held in the former opinion, the allegations of fraud based upon alleged representations as to ability of defendants, being matters of mere opinion, do not justify equitable relief, and the record now before us does not show that defendants at the time the contracts were executed, entertained any intention not to perform.

The record discloses that shortly after the execution of the agreement of May 1, 1934, Microid selected a site for

the laboratory and equipped it under deStubner's direction. There it conducted experimental work under deStubner's supervision, which led up to the exercise of the option in the summer of 1936. Likewise from that time until shortly before September, 1937, when deStubner removed his residence to New York, further experimentation was conducted in the laboratory. After deStubner's removal to New York, further experiments were conducted by Roberts, United Carbon Company's chief chemist. During 1937 deStubner expressed dissatisfaction with the progress of the work of developing his inventions and processes. On October 29, 1937, as the result of then pending litigation, based upon claimed infringements of deStubner's patents, Microid gave licenses to use the patents in lacquers to Egyptian Manufacturing Company, E. I. duPont de Nemours and R. B. H. Lacquer Base Company. As the result of that settlement, the following amounts were paid: Egyptian Manufacturing Company, $2,500.00; duPont, $12,000.00; and R. B. H. Lacquer Base Company, $10,000.00, all of which sums were received by deStubner. During the months of January to April, inclusive, 1938, deStubner made efforts to interest Hellmuth Corporation, a corporation skilled in the field of both blacks and colors, in his inventions and processes. About this time, United, Inc., had a controversy with deStubner over the repayment by him of $5,000.00, which the former claimed to have advanced for the purpose of aiding in the patent litigation. On May 21, 1938, deStubner gave Nelson and Microid written notice of the termination on August 1, 1938, under paragraph 5 (b) of the deStubner-Microid agreements, and of his resignation as technical director thereunder. In that notice he stated that it was given with the understanding that, "if someone on behalf of Microid Process, Inc., desires to pay me on or before August 1, 1938, the difference between the sums which I have received since August 1, 1937, and the sum of $12,000.00, that the existing agreements may continue in force after August 1, 1938." Largely as the result of plaintiff's efforts a free option was given to Hellmuth,

under an agreement dated May 27, 1938, and on July 12, 1938, plaintiff withdrew the notice of cancellation of May 21, 1938, and agreed in writing to accept the sum of $625.00 per month beginning August 1, 1937, and to continue until the exercise or termination of the Hellmuth option agreement. Under the Hellmuth agreement that corporation, with the direction of its president Clarkson, engaged in experimentation involving deStubner's inventions and processes. In October Clarkson died, and there is some evidence that the work of experimentation continued under other members of the Hellmuth organization. But finally on March 1, 1939, deStubner gave notice of cancellation of the Microid license, citing as grounds therefor breach of the license agreement and Microid's insolvency, and on March 22, 1939, this suit was brought.

We are confronted initially with the question: What, under the facts of this record, is meant by "effort to exploit"? Defendants' counsel suggest that they "understand the process of exploitation to include any step leading to the use of the inventions on a revenue-making basis," citing *Morton Trust Co.* v. *American Salt Co.*, 149 F. 540, 542. Of course, exploitation, in the sense in which the word is used here, means something more than demonstration: it means, in the final analysis, the commercialization of the inventions and processes. Undoubtedly when the plaintiff executed the agreement with United, Inc., and the patent license to Microid, he had in mind that he was taking a step which would ultimately lead to the commercialization under his patents and applications for patents. The defendants, Microid and United, Inc., in accepting, as they did, the implied covenant to use a reasonable effort to exploit, did so because they too thought they would profit thereby. It follows that the relative duties and rights of the parties can not be successfully appraised, unless we are able properly to evaluate what plaintiff had to offer and what defendants had to give.

When the option agreement of May 1, 1934, was ac-

cepted, plaintiff had certain enumerated patents already issued, patents granted but not issued and applications for patents pending in the United States Patent Office. If, at the time the agreements were entered into, plaintiff's inventions and processes were sufficiently developed and his patent position sufficiently strong that the licensee could exercise the right to use plaintiff's inventions and processes under his patents and sell the products resulting therefrom, without the probable risk of incurring expense and hazardous litigation or suffering damages for infringement, then Microid could have safely accepted the license without being required, as a practical matter, in order to profit thereunder, to make any attempt to strengthen plaintiff's patent position or by experimentation further to develop plaintiff's inventions and processes. But such was not the case, as shown by this record. Whatever confidence deStubner may have had in his inventions and processes, they were not, at the time the option was exercised, in such state of development or embraced in a patent position sufficiently strong that, without further development of the inventions and processes themselves and further strengthening of the patent position, defendants could have successfully sub-licensed the right to plaintiff's inventions and processes or profitably have placed upon the market the products thereof.

deStubner himself, by letter dated June 30, 1936, to Nelson, president of the three defendant companies, indicated that he held an incomplete patent position. He wrote that unless his "inventions are adequately protected by patents," he would lose the investment which he had made in his inventions, as well as any chance of future income from them. This letter was evidently written for the purpose of urging the early exercise of the option, and it further states: "The patent situation, therefore, requires my immediate attention * * *. Under present conditions it is impossible for me to protect this investment as it should be protected." Moreover, Smith, deStubner's personal patent attorney, who later was also

employed by Microid in the furtherance of deStubner's patent position, on March 5, 1935, wrote to United Carbon Company reporting on plaintiff's then patent position, and indicated therein that plaintiff had not as yet obtained a very strong patent situation and suggested two tentative plans in the exploitation of plaintiff's inventions and processes. Evidently realizing the necessity of a strong patent position as the basis for the successful commercialization of the inventions and processes and products thereof, experiments were conducted in the Bullitt Street laboratory, with deStubner in charge, from shortly after the option agreement until a short time before he returned to New York in September, 1937; and thereafter, as heretofore stated, the work was carried on by Roberts, during the course of which Smith collaborated with the plaintiff, and financed by the defendants to the extent of more than $25,000.00, diligently and ably used his professional services for the betterment of plaintiff's patent position. In this work he visited the laboratory on a number of occasions and actively prosecuted deStubner's interests in hearings before the Board of Appeals in the United States Patent Office. So it can be seen that a good part of defendants' efforts leading toward the exploitation of plaintiff's inventions consisted of an effort to give the plaintiff and Microid, as licensee, and United, Inc., as sub-licensee, a strong patent position.

These efforts were a necessary step in attaining the mutual object of the parties, namely, the derivation of profits from plaintiff's inventions and processes. Unless deStubner's patent position was strong and almost impregnable, the products derived therefrom could not have been sold without the risk of infringement suits, or damages for breach of contract, nor could a licensee well have found an easy path leading toward the sub-licensing of the right to use the inventions and processes because prospective licensees would hesitate to accept a license, the exercise of which might result in litigation.

Notwithstanding plaintiff's patent position, contact was made with many of the business customers and friends

of United Carbon Company in the field of black pigments. United States Rubber Company, one of United Carbon Company's long-established and large customers, was contacted without success. Likewise, beginning in May, 1936, and continuing until about the middle of 1937, contact was made with Imperial Chemical Industries, a chemical manufacturing company, located in Great Britain. Representatives of this company came to Charleston for the purpose of investigating deStubner's inventions, and the United Carbon Company's engineer, Hilding Hanson, made a trip to England in the summer of 1937 for the purpose of submitting a plan to the British company, under which it would become the licensee of the deStubner inventions throughout the world, except North America, and the results of a research to be conducted by its technical staff would be pooled with those already attained by deStubner. In September, 1937, this company informed Microid that the deStubner processes were no improvement over those well-known to the industry. Late in 1936 Coates Brothers & Company, Ltd., likewise a British firm, manufacturers of inks, both black and colored, were invited to Charleston to study the deStubner processes. After the consent of Imperial was obtained, a proposal was made to that firm, limited, however, to England and to carbon blacks. The latter limitation was made so as not to interfere with whatever interests Imperial had in the field of colors. After some correspondence, during which time there was an exchange of samples, Microid was informed that the deStubner processes were no improvement over other available methods. In December, 1937, and up until the notice of rescission in March, 1939, efforts were made by Microid, through Smith, to interest Pontiac Varnish Company in the field of black or colors, or both. In furtherance of this effort, Smith, by letter dated January 20, 1938, advised Pontiac that Mr. Nelson and Mr. Swartz, the latter being attorney for all three defendants, were anxious to discuss with Pontiac any proposal which the latter would care to make, if, after demonstration, it would care to become commercially inter-

ested in the deStubner processes. Three plans of embracing the black and color fields were suggested. These negotiations were without success, and were terminated on or about the time of the final notice of cancellation.

In November, 1937, plaintiff contacted Charles F. Parsons, then president of the Hellmuth Corporation, one of a group of companies engaged in the manufacture of ink and colors. After a period of about six months of effort, United, Inc., Hellmuth, Microid and deStubner entered into the agreement dated May 27, 1938, which provided that Hellmuth would have a free license for one year to practice the Microid processes at the former's expense, and for its profit sell any products derived therefrom. This agreement provided that the plaintiff would cooperate with Hellmuth in the development of dispersions suitable to each subject matter for dispersion, and that Hellmuth would proceed in the development of certain dispersions in the fields of blacks and colors. Nothing of value came of this arrangement. In the field of blacks, to a large extent through deStubner's efforts, The Standard Register Company of Dayton, Ohio, became interested in the base for carbon paper coating, which, in October, 1937, resulted in that company becoming a substantial customer of carbon blacks.

deStubner and Smith testified somewhat in detail as to efforts they made to incite interest in the former's inventions and processes. The very fact that their travelling expenses and, in the latter's case, fees were paid by defendants, indicates that they were, in fact, acting as defendants' agents in an effort to make the inventions and processes profitable.

United, Inc., found it advisable to establish a plant for volume production of carbon black products. On February 27, 1939, it leased a plant at Newark, New Jersey, where it used the process derived from an open mixer kneading method, suggested in certain of plaintiff's patents, and developed a business for carbon black mineral oil dispersions for news ink and resin dispersions for paint. From 1936 to 1940, inclusive, the gross sales of products, involv-

ing aqueous dispersions of carbon black, increased from $72.18 to $49,011.42.

The record further discloses that the efforts to commercialize the deStubner processes caused defendants to expend a net outlay of over two hundred thousand dollars, of which amount, plaintiff, in addition to the $25,000.00, growing out of the settlement of the infringement litigation, received about forty-five thousand dollars. These expenditures of themselves do not establish that defendants made a reasonable effort to exploit the deStubner inventions and processes. They, however, furnish a background which gives credibility to evidence, introduced by defendants, bearing upon the efforts which they claim they had, in fact, made.

But plaintiff's counsel say that Microid failed to use a reasonable effort in the field of colors; and, therefore, under our former holding, the original, as well as the sub-license agreement, is subject to cancellation. On this point it is urged strenuously that the field of black was stressed and the color field neglected. It must be stated that counsel's position is not entirely without basis. It does not, however, take into account the limitations in the defendant corporations' experience in the color field, the manner in which plaintiff first approached the United Carbon Company in his early efforts to license the use of the inventions and processes under his patents, and his own attitude, as well as that of Smith, bearing on the question whether the field of blacks should be stressed by experimentation and the color field handled in some other way.

If it is true that the experimental activities were largely in the field of carbon blacks that, under the state of this record, is something of which deStubner should not complain. In the first place, United Carbon Company was engaged almost entirely in the production of gas and the manufacture of carbon black, a fact evidently well known to him; yet, on March 31, 1932, he stated in a letter to United Carbon Company: "I am seeking to interest you in a manufacturing proposition which is related to your

business." Later, in the fall of 1933, deStubner had a conversation with C. A. Greene, technical expert and vice president in charge of technical production of Valentine Varnish Company, who was acquainted with Nelson and Higgins, United Carbon Company's sales manager. This conversation dealt largely with a possible contact with United Carbon Company for the purpose of using deStubner's processes in the field of blacks. In fact, on November 8, 1933, following this conversation, plaintiff wrote Greene concerning the royalties which he thought he should receive, and listed certain products which he proposed to make, all of which were in the field of blacks. On November 14, 1934, he wrote Nelson a letter, reporting on three processes, the first involving the dehydration of Water-wet nitro-cellulose, which was later abandoned at his own instance, and the other two dealing solely with the dispersions of carbon blacks. On May 13, 1935, he again wrote to the effect that "the subject of grinding carbon blacks has occupied for a long time a first place in my thoughts". Again, on July 30, 1935, he wrote a letter, designated "Concrete Black", and, following the exercise of the option and the contracts of July 31, 1936, the burden of the correspondence, activities, and conferences between the parties was largely confined to the black field. For example, on October 15, 1936, de Stubner again wrote, advising that "concentrated work be done in connection with the carbon black dispersions for the manufacture of carbon paper compositions and carbon black dispersions for coating compositions on resin bases." Smith likewise stressed exploitation in the black field, and, under date of July 22, 1937, he again urged an active policy of commercialization by making available to customers proved carbon black products, and negotiating licenses outside the carbon black field with concerns active in such fields. deStubner's interest in carbon black is further attested by a letter, dated July 10, 1939, to the president of Hilton-Davis Company of Cincinnati, Ohio, in which he stated, "In the last few years I have been interested specially in carbon black * * *"

It is important that deStubner was in virtual charge of the Bullitt Street laboratory from the time of its establishment in 1934 until shortly before he removed to New York. If undue stress was placed upon exploitation in the field of blacks, the responsibility therefor rested just as much upon plaintiff, if not more than upon defendants. In short, the record discloses no such dereliction in the development and exploitation of plaintiff's inventions and processes in either the black or color field as would prompt us to hold that the agreements of July 31, 1936, could be cancelled on that ground. In so holding, we have not attempted in this opinion, as it would be impracticable to do so, to narrate with any degree of detail the many matters contained in this record. In deciding that there has been no failure to use a reasonable effort to exploit, we have been guided by the rule that one who seeks cancellation of an instrument has the burden of proof and must establish his right to cancellation by clear and explicit evidence. *Knipp* v. *Myers,* 98 W. Va. 151, 126 S. E. 575; 9 Am. Jur.; Cancellation of Instruments, section 60.

But plaintiff also seeks rescission on the ground that there has been an improper use of his confidential data, ideas and disclosures and a wrongful recognition of a patent known as the "Amon" patent, and the use of his processes thereunder in violation of the patent agreements. It is asserted that Roberts has appropriated some of plaintiff's inventions and processes by obtaining patents in his own name on the basis of certain claimed improvements, and that the Amon patent was wrongfully recognized by defendants, though it embraced processes and ideas originated by deStubner. Even if true, these assertions are not ground for rescission. Forfeiture of a license will not result "from the fact that the licensee has infringed the patent in doing acts, with the invention, which were unauthorized by the license. The license will not protect him in such things, but it will continue to protect him in doing the acts which it did authorize." Walker on Patents, Deller's Edition, Vol. 2, Section 390, citing *Wood* v. *Wells,* 6 Fish. Pat. Cas. 382, 383, Fed. Cas. No. 17,967;

*Steam Cutter Co.* v. *Sheldon,* 10 Blatchf. 1, Fed. Cas. No. 13, 331.

Defendants further contend that deStubner's participation in the agreement consummated between Microid and the Hellmuth Corporation, together with his cancellation of his first notice incident thereto, constitute a waiver of any alleged dereliction of duty on Microid's part. In view of our finding that there has been a reasonable effort on Microid's part to exploit in the field of color pigments, we do not think it necessary to discuss this position.

· But is plaintiff entitled to cancellation on the ground that Microid is insolvent? If such relief is to be had, it, of course, would not be based upon any breach of the contract. Its basis would be found in paragraph (5) of the deStubner-Microid agreement, reading in part: "The license hereby granted may be terminated (a) by an adjudication of bankruptcy or insolvency in the licensee." In the former opinion, this Court held that "because equity does not favor a circuity of actions, the adjudication of insolvency, if warranted by the facts, may be made in the instant suit." Under the former decision, plaintiff's counsel evidently regarded the prayer of the bill of complaint as not being sufficiently broad to justify the cancellation of the sub-license agreement from Microid to United, Inc. Likewise defendants' counsel, as indicated in their brief, entertained the same thought, and the bill of complaint was amended in an evident attempt to broaden the prayer to conform with the former decision. That question, however, becomes moot in view of our holding that plaintiff is not entitled to cancel on the basis of failure to exploit his inventions and processes. In passing, however, we do not hesitate to say that when the former decision was rendered, this Court thought, as it now does, that the exception of "such rights as said United Carbon Co., Inc., and said United Carbon Company may have by reason of the license granted to said United Carbon Company, Inc., by said defendant, Microid Process, Inc., dated July 31, 1936" is an exception within the exception "except as to all licenses which the said Microid

Process, Inc., has heretofore lawfully granted." What then is the effect of the amendment, so far as an adjudication of the question of insolvency is concerned? It simply furnished a prayer, as the prayer in the original bill of complaint did, seeking cancellation of both the license and sub-license agreements. Because it is broader than the relief to which plaintiff may be entitled is no bar if the facts warrant the granting of such relief. Notwithstanding the amendment the bill of complaint remains intact as to its allegations of insolvency. So the question is squarely before us whether plaintiff is entitled to cancellation on the ground of Microid's insolvency.

The original bill of complaint alleges that Microid has no assets except plaintiff's inventions, that it is indebted to United, Inc., in the amount of $107,000.00, and that Microid was without any revenues with which to pay its indebtedness. Defendants' joint and separate answer admits that Microid has never at any time received any earned revenue, income or profit from any source; that the amount of royalties accruing to Microid from United, Inc., if any, has never been determined; and that the indebtedness of Microid to United, Inc., for money advanced, approximately $50,000.00, is vastly in excess of any possible royalty that could have accrued from the operations of United, Inc. Thus it appears that there is no need to go beyond the allegations of the original bill of complaint and answer to reach the conclusion that Microid, as shown by this record, is insolvent, and there is nothing in the evidence to indicate otherwise. The fact that plaintiff alleges that his inventions are valuable is of little moment, because defendants undertake to escape the burden resting on them under the implied covenant to use a reasonable effort to exploit, on the basis that these inventions, in view of the character thereof and the present status of deStubner's patent position, are to a large extent valueless. Microid can not take this position and thus escape the implied duty to exploit, and also assert that the inventions and processes are valuable for the

purpose of relieving itself from the operation of section (5) (a) of the deStubner-Microid agreement.

This Court usually will not in the first instance pass upon a question which has not been passed upon by the trial court, but the rule should not be applied here. The legal questions involving the allegations of the original bill of complaint, relating to Microid's insolvency, were decided by the trial chancellor in overruling the demurrers, and by this Court in sustaining his rulings; and the bill of complaint, as amended, read with the joint and separate answer, presents for judicial determination no issue of fact relating to Microid's insolvency.

Cursory consideration of the factor of insolvency might lead to the conclusion that deStubner is estopped to employ Microid's insolvency as a medium to rescind the deStubner-Microid agreement of July 31, 1936, or that it is inequitable that Microid's insolvency should be used as a basis for rescission of its agreement with deStubner when that status is the result of its expenditures in the exploitation of the latter's processes. It is probable that argument may be advanced that of Microid's existing indebtedness, a large portion found its way into deStubner's hands. But, the funds expended by Microid were utilized to further not only the color processes but to develop the field of carbon black. In fact, the Colloidal experience alone represents approximately forty-six thousand dollars of Microid's indebtedness. The funds paid directly to deStubner by Microid likewise reflected efforts to exploit commercially the black processes, the development of which has reached a point where admittedly such efforts are becoming fruitful.

The effect of Microid's insolvency already has been discussed in our former opinion. "Relief, solely on the ground of Microid's insolvency, is restricted to Microid alone; because the agreement between plaintiff and that corporation expressly provides that upon its termination upon adjudication of bankruptcy or insolvency 'all licenses * * * or license fees reserved to Microid under the terms

of each license granted by it' shall become plaintiff's property and such licensee shall thereafter deal with plaintiff as if the license agreements had been made directly with plaintiff as licensor." And further the agreement provides, "in the event of termination on the ground of bankruptcy or insolvency all of Microid's rights shall revert to deStubner." It follows that plaintiff is entitled to have the deStubner-Microid agreement cancelled and recapture his inventions, improvements and discoveries in the field of colors, and the provisions of paragraph 7 of the agreement applied.

Plaintiff's counsel further assert that the circuit court should have decreed to the plaintiff against United Carbon Company the same relief granted as to United, Inc., and Microid. It is asserted, in support of this position, that United Carbon Company owns all of the stock and assets of United, Inc., and the latter company owns two-thirds of the stock of Microid, and Nelson is president, active executive, and directing head of all of the defendants; and finally counsel say that United Carbon Company has officers, directors, agents, and employees in common with United, Inc. Are we justified under this state of the record in ignoring the corporate entities of the three corporations, and invoking the so-called instrumentalities rule? In *Atwater & Co.* v. *Fall River-Pocahontas Collieries Co.*, 119 W. Va. 549, 195 S. E. 99, we held that the corporate veil will be torn away "whenever the occasion arises to prevent a fraud or a wrong." To like effect see *Southern Cooperative Foundry Co.* v. *Warlick Furniture Co.*, 117 W. Va. 336, 185 S. E. 773, and *Tynes* v. *Shore*, id. W. Va. 335, id. S. E. 845. Here United, Inc., was formed not for the purpose of perpetrating a fraud upon plaintiff, but to take over and hold all of United Carbon Company's carbon black properties, and under the agreement of July 31, 1936, between plaintiff and United, Inc., the former assented to United, Inc., succeeding to the rights of United Carbon Company under the option agreement of May 1, 1934. If there was any fraud on the part of United Carbon Company or the other defendant corporations, it was not

at the inception of the agreements of July 31, 1936, and there is no evidence of sufficient probative force to establish that defendants have committed a fraud under the veil of their corporate entities. If it is true, as plaintiff's counsel assert, that United Carbon Company has collected from The Standard Register Company the sum of $13,-481.00 for finished carbon copy ink, which money belongs to Microid, which we do not decide here, that, as well as all questions of accounting between United Inc., Microid and plaintiff were not before the circuit court under the pleadings in this case, but, of course, plaintiff by this decision is not precluded from asserting any rights which he may have under the contracts or against any of the defendants or third parties for infringement or wrongful control or operation of his inventions and processes. We merely say that such matters, if they exist, are not properly before us.

For the foregoing reasons we reverse the circuit court's decree and remand this cause for entry of a decree in conformity with the principles herein stated.

*Reversed in part; affirmed in part; and modified.*

Fox, PRESIDENT, dissenting in part, concurring in part:

I concur in that part of the opinion of the majority which, in effect, restores to the plaintiff below all patents in the field of color pigments, and saves to the United Carbon Company, Inc., its exclusive right to exploit black pigments, under its license of July 31, 1936. I dissent from that part of the said opinion which cancels and rescinds the agreement of the same date, between plaintiff and Microid Process, Inc., subject only to the rights of the United Carbon Company, Inc., to use and exploit black pigments, and which requires the payment of royalties accruing thereunder to the plaintiff rather than Microid Process, Inc. I think Microid should be decreed to be entitled to such royalties, and that the plaintiff's interest therein should be limited to his one-third ownership of Microid, and to such other rights as he may possess under the contract aforesaid.

I approve and adopt the detailed statement of facts contained in the majority opinion, and they will be referred to only briefly and incidentally. References to expenditures for exploitation are intended to include those made by the United Carbon Company, under the option agreement, as well as those thereafter made by Microid, and this also applies to the use of the Charleston laboratory.

The trial in the circuit court was limited to the question of whether there was reasonable exploitation in the field of colors, as distinguished from black pigments. That action was taken under our holding in this case, 121 W. Va. 783, 6 S. E. 2d 777, wherein we held that "the failure to use a reasonable effort to exploit the inventions in the field of color pigments would render both agreements voidable and subject to be rescinded in a court of equity." It is understood that the agreements referred to were plaintiff's contract with Microid Process, Inc., and the license from Microid to the United Carbon Company, Inc. However, in considering the appeal before us, I do not think we should be so limited. If the contract of July 31, 1936, be held to be entire, the exploitation in the field of black pigments, as well as in the field of color pigments, should be considered together. The fact that black pigments were fully exploited, as seems to be conceded, should, in my opinion, have a bearing upon whether we cancel the contract in its entirety.

There is another matter which should be here mentioned. The relief prayed for in plaintiff's original bill was the rescission of the contract between him and Microid, subject to such licenses as Microid had legally issued thereunder; but by his amended bill he asks for what is, in effect, a forfeiture of the rights of Microid and its licensees, including the United Carbon Company, Inc., and it is assumed that this latter position is based on our former decision herein. We have many times held that equity will not enforce the forfeiture of a vested estate because of the breach of a condition subsequent. *Craig* v. *Hukill*, 37 W. Va. 520, 16 S. E. 363; *Spies* v. *Railway Co.*, 60 W. Va. 389, 390, 55 S. E. 464; *Pheasant* v.

*Hanna,* 63 W. Va. 613, 60 S. E. 618; *Pyle* v. *Henderson,* 65 W. Va. 39, 63 S. E. 762; *Horse Creek Coal Land Co.* v. *Trees,* 75 W. Va. 559, 84 S. E. 376; *Chambers* v. *Perrine,* 81 W. Va. 321, 94 S. E. 381; *Adkins* v. *Gas Co.,* 113 W. Va. 490, 168 S. E. 366. Of course, the distinction between a forfeiture, to which these cases technically relate, and the rescission of a contract, involving a forfeiture of rights, must be recognized, yet, while a contract may be rescinded for good cause, even where a forfeiture is involved, it can only be done where the evidence on which the decision is based is clear and convincing. *Fishack* v. *Ball,* 34 W. Va. 644, 12 S. E. 856; *Isner* v. *Nydegger,* 63 W. Va. 677, 60 S. E. 793; *Knipp* v. *Myers,* 98 W. Va. 151, 126 S. E. 575. It requires stronger proof than that required to enforce specific performance. *Hagan* v. *Taylor,* 110 Va. 9, 65 S. E. 487. Giving weight to these considerations, I do not think the evidence tending to show non-exploitation in all fields of color on the part of Microid, is sufficient to justify a rescission of the contract of July 31, 1936.

There is nothing in said contract which distinguishes or separates black pigments from the field of colors. When Microid granted an exclusive license to the United Carbon Company, Inc., to commercially exploit the field of black pigments, that action seems to have satisfied the plaintiff. So far as I can observe from the record, there is no complaint on that point. The plaintiff was appointed research director for Microid, and furnished a laboratory which he had previously selected while operating under the option agreement. He seems to have understood that the patent situation, with respect to black pigments, was unsatisfactory, and, therefore, he devoted a great deal of his laboratory work to research along that line. The same situation existed with respect to color pigments, and there was no limitation placed upon him, and nothing to indicate that he would not have been furnished the facilities necessary to improve the patent situation with respect to them. Notwithstanding the contention of the plaintiff that he was not to be held responsible for this research work, and the improvement of the patent situation, I think

a fair interpretation of the agreement, coupled with the plaintiff's conduct over a course of years, clearly indicates that he was expected to participate in the exploitation, at least to the extent of continuing his work in extending his investigations to the end that his processes might be perfected, and new patents secured. Not only was a laboratory furnished for that purpose, but plaintiff's expenses were paid by United Carbon Company, and Microid over a long period of time. Approximately $25,000.00 was advanced by them in paying fees of counsel and other expenses connected with improving the patent situation, and this, as I understand it, covered all fields. The necessity for perfecting plaintiff's inventions, and improving the patent situation with respect thereto, is made manifest by the large expenditures made, and of this the plaintiff must have had full knowledge. Notwithstanding all that was done in relation to improving the patent situation, Smith, the attorney for plaintiff, late in 1938, and only a few months prior to the attempted cancellation of the contract, indicated that the patent situation was not then satisfactory. This, I think, has a bearing upon the fact that what Microid did in exploiting color pigments had not served to bring about their commercial exploitation.

There is nothing in the contract which required their exploitation in all events, and no implied requirement to such effect. All that Microid was required to do, giving its implied duty as broad a scope as possible, was to endeavor to exploit what it then had, or which new investigations would create. If, because of the imperfections in the inventions, or an unsatisfactory patent situation, the inventions could not be exploited, the burden for the failure should not fall on Microid. I do not think it was contemplated that Microid should exploit these inventions commercially. It was organized solely for the purpose of securing licenses of the various inventions, and to exploit them in that way. Microid had no funds with which to commercially exploit any of these inventions, and never attempted to do so, and the plaintiff knew of this fact, because he owned a one-third interest in the stock of that company,

and will be held to have been familiar with its activities. The plaintiff seems never to have demanded any commercial exploitation, his complaint being that Microid was not exerting itself, in a proper way, in the exploitation of his inventions through placing them in the hands of licensees who would exploit them commercially.

I have no inclination to depart from the former decision of this Court in this case, but the application of an abstract statement of law to a state of facts leaves us a good deal of freedom. I think there was an implied covenant on the part of Microid to make a reasonable effort to exploit all pigments, and a clear failure to perform its duty in that regard as to color pigments, would entitle the plaintiff to cancellation of the whole agreement. I think, however, such reasonable effort has been made. It is difficult to separate the efforts made to exploit black pigments from those made in the field of colors. I think the efforts made covered all fields. These efforts included the following: Money advanced to improve the patent situation in the sum of approximately $25,000.00; the expense of establishing a laboratory in Charleston; payment of the plaintiff's expenses in connection with this laboratory and elsewhere; the payment of the sum of $45,710.60 to the plaintiff himself; advancements of money to a total of $318,329.80, in the various efforts to exploit, which covered money advanced in connection with patent improvements; salary to the plaintiff in lieu of dividends on his Microid stock, and money lost in various ventures connected with efforts to exploit. Some returns of this money were had, so that the net outlay is $224,808.35. This, in itself, indicates to me good faith, because business concerns do not risk such large sums of money in idle ventures. There was, in my opinion, a good faith motive back of these expenditures. Furthermore, as is particularly pointed out in the majority opinion, efforts were made to interest some of the largest chemical concerns in this country and abroad, and success in interesting any one of these large concerns would probably, in itself, have amounted to reasonable exploitation. Effort was made in 1936 and 1937

to interest the Imperial Chemical Industries, a large English concern. In 1936, Coates Brothers & Company, Ltd., another important English concern, was contacted. In this country, contacts were made with Baker-Perkins Company, E. I. du Pont de Nemours & Company, Egyptian Lacquer Company, Pontiac Varnish Company, United States Rubber Company, Goodyear Tire & Rubber Company; and in 1938, the Charles Hellmuth Printing ink Corporation became interested, and at the time of the attempted cancellation of the Microid contract, the option held by Hellmuth Corporation had some months to run. The contacts with all of these large industrial concerns do not indicate that Microid was idle, but, on the contrary, convinces me that an honest effort was being made to exploit plaintiff's inventions.

These contacts and efforts were not successful in the matter of exploitation in the field of colors, but I think it clear that they were unsuccessful because of the fact that plaintiff's inventions were not considered as great improvements over the processes already employed by these concerns. They simply were not interested, because they could not see the advantage to them of casting aside processes already in use, and substituting therefor plaintiff's inventions. This is the practical explanation of the failures. In addition to this, there is the testimony of eminent chemists who do not ascribe to plaintiff's inventions the importance which he attaches thereto. Plaintiff's impatience at what he thought was Microid's dereliction is quite understandable. As referred to in the record, these inventions were the mind children of the plaintiff, and he had great confidence in them. He naturally thought the chemical trade would be eager to take advantage of his work. The other side of it is also understandable. Business men approach a proposition of this kind from a different viewpoint. They want to be sure that what they are getting is an improvement over what they already have, and are not willing to invest large sums of money on uncertainties. All this helps to explain what may be perfectly honest convictions, on the part of both the plaintiff

and Microid, of the correctness of their position. All we can say is that this case should not be decided upon the idea of either as to the correctness of their position, but upon the cold facts of the case. I think the facts, as developed by this record, fail to show, to the extent necessary to justify rescission, that Microid failed in its duty under its contract with the plaintiff.

Logically, this would seem to require the dismissal of the plaintiff's bill, but I do not think complete equity would be done between the parties should such a course be taken. While I think Microid has substantially and reasonably performed its undertakings, it must be held that its efforts to exploit in the field of color pigments have not been successful. There is a wide difference of opinion between it and the plaintiff as to the value of his inventions in that field. Microid, apparently, does not have the same confidence and faith in these inventions as those possessed by the plaintiff. This being true, it is doubtful whether Microid, if allowed to retain these inventions, would ever be able to exploit them to the extent that one having faith therein would be able to do. This does not mean that, for that reason alone, plaintiff is entitled to have these inventions returned to him, but it does create a situation where the equities of the case would be best served by such a step.

Ordinarily, the rescission of a contract must be entire. The rule that "where an agreement is rescinded it must be entirely rescinded," is of general application. *Worthington* v. *Collins' Admr.*, 39 W. Va. 406, 19 S. E. 527; *Silliman* v. *Gillespie,* 48 W. Va. 374, 37 S. E. 669; *Bruner & McCoach* v. *Miller,* 59 W. Va. 36, 52 S. E. 995; *Ellison, Son & Co* v. *Flat Top Grocery Co.,* 69 W. Va. 380, 71 S. E. 391, 38 L. R. A. (N. S.) 539; *Dorr* v. *Midelburg,* 65 W. Va. 778, 65 S. E. 97, 23 L. R.A. (N. S.) 987. However, where a contract is severable, one part alone may be rescinded and the other affirmed. *Norman Lumber Co.* v. *Keystone Mfg. Co.,* 100 W. Va. 515, 131 S. E. 12; *Dorr* v. *Midelburg, supra;* 9 Am. Jur., 403. The rule that rescission must be entire is not an inflexible one. While we have treated the contract of July

31, 1936, as entire, and have considered exploitation as covering all pigment fields, it seems true that, by the act of the parties themselves, they recognized some distinction between the two, and acted on that distinction. For example, plaintiff himself devoted his laboratory work•to black pigments alone, and those pigments were satisfactorily exploited. The complaint is as to the color pigments, and, if there be substance in the plaintiff's contentions, they apply more strongly, if not entirely, to the color field. Therefore, I see no reason why, notwithstanding our holding that, taking all fields together, there has been reasonable effort to exploit, we may not, for the purpose of this case, and in an effort to grant complete equity, recognize the practical separation between the two types of pigments, and require the surrender to the plaintiff of the patents covering the color pigments field. This may be done by a direct holding, or by attaching a condition to the court's decree. Equity having power to grant all relief which the case calls for, may attach conditions thereto, and a decree which would save to Microid all of its rights with respect to black pigments could have attached thereto a condition requiring the surrender to the plaintiff all of his inventions in the color field. There is authority for this procedure. In *Veazie v. Williams,* 8 How. (U. S.), 134, 12 L. Ed. 1018, a condition was attached to a decree in that case, and the court said:

> "This court on its equity side, says Chief Justice Marshall, is 'capable of imposing its own terms on the party to whom it grants relief.' (*Mar. Ins. Co.* v. *Hodgson,* 7 Cranch, 336, 337.) And it will not grant relief even in fraud, unless the·party 'wishing it will do complete justice.' (*Payne* v. *Dudly,* 1 Wash. (Va.) 196; 1 Johns. Ch. 478) * * * Here, then, in the decree, we can set aside the whole sale and contract; but, instead of doing it unconditionally, the plaintiff should be required first to do equity, and to allow any countervailing equities on the part of the respondents,—which are, to let the sale itself stand at what was fairly bid for the property, and require only the residue of the consideration, being entirely fraudulent, to be restored."

That was a case where the plaintiff had been fraudulently induced to make an extravagant bid at a sale of real estate, and in a suit to rescind the sale, he was permitted to retain the property by paying the fair value of the same. See also, *McGhee* v. *Bell,* 170 Mo. 121, 70 S. W. 493, 59 L. R. A. 761, 9 Am. Jur. 403. I see no reason why the same rule should not be applied where a defendant is decreed to be entitled to certain rights. Ordinarily, terms are imposed where relief is granted to a plaintiff, but in this instance we are, by decree, vesting in the defendant, Microid, certain rights, and I know of no reason why we cannot attach to such decree conditions dictated by equitable considerations. I quite agree that the logic of the situation would be to dismiss the plaintiff's bill, but I am of the opinion that a decree that dismisses the plaintiff's bill as to the black pigments, and requires the surrender to him of his inventions in the field of colors, can be justified upon broad equitable principles.

The opinion of the majority is necessarily based upon the theory that plaintiff is not entitled to relief on the grounds of non-exploitation. If the contrary were held, then we would be forced to cancel the contract in its entirety which would carry with it the cancellation of the license executed by Microid to United Carbon Company, Inc. The majority opinion saves to the United Carbon Company, Inc., the use of patents in the field of black pigments, but under the terms of the contract between the plaintiff and Microid, cancellation on the grounds of insolvency would leave the Carbon Company protected in its rights under its license, but would substitute the plaintiff for Microid as the licensor and require royalties to be paid to him.

The technical insolvency of Microid may be admitted. In fact, it is not even contended by Microid that it is solvent. It is indebted in a sum in excess of two hundred thousand dollars. The value of the patents held by it, under its contract with plaintiff, is not shown, and possibly, cannot be shown; but it is apparently conceded that they are not of sufficient value to equal the large in-

debtedness. I think, however, the solvency contemplated by the contract, and for which the same might be cancelled, should be interpreted as that character of insolvency which would prevent any further exploitation of plaintiff's patents. That situation never did arise in this case. United Carbon Company, Inc., was continually advancing money to Microid to aid in exploitation. Microid was controlled by the United Carbon Company, Inc., and the corporate set-up may be more or less ignored. The financial backing of this exploitation was furnished by the United Carbon Company, Inc., through its instrumentality, Microid Process, Inc., and there is no question of the solvency of the Carbon Company.

But if this position be not tenable, I think it clear that the plaintiff is estopped to set up this insolvency, and have his agreement cancelled on that ground alone. The insolvency of Microid developed immediately after the contract of July 31, 1936, yet the plaintiff stood by and acquiesced in continuous increases in Microid's indebtedness, accepted from it personally large sums of money, permitted approximately $25,000.00 to be expended for his benefit in improving his patent situation, and allowed other large expenditures, making up the total of Microid's indebtedness. The contract is, of course, explicit on this point. The plaintiff was originally entitled to have the contract cancelled on the ground of insolvency; but parties are not always entitled to have the plainest of contract provisions enforced. Events may occur, after a contract is executed, which give rise, as in this case, to a situation where a party will not be permitted to insist upon the carrying out of some plain provision of a contract. I think this is such a case. I do not believe that a court of equity should enforce the forfeiture of Microid's rights in this instance, on the ground of its insolvency, where that insolvency was developed by the expenditure of money in the interest of the plaintiff's inventions, and when he knew of such expenditures, acquiesced therein, and personally received a substantial share of the money borrowed, and which made Microid insolvent.

I find no fault with the ruling of the majority which saves to United Carbon Company, Inc., the use of patents in the field of black pigments, but I do question the equity of the further holding, that, applying the insolvency provision of the contract strictly, the plaintiff will become entitled to the incomes from license held by the Carbon Company, rather than Microid. Of course, after debts are paid, the plaintiff would be entitled to his share of the subsequent dividends derived from royalties or otherwise, and it may be that the plaintiff is entitled to some consideration with respect to the salary to be paid to him in lieu of dividends on his stock in Microid.

When we take into consideration the large expenditures made by Microid, some of which must have inured to plaintiff's benefit in the improvement of the color pigment situation, a decree which releases to him the unincumbered use of such pigments, is, I think, as much as he can reasonably demand. I would, therefore, remand the cause with instructions to enter a decree upholding the right of Microid to exploit the black pigments covered by its original contract with the plaintiff, conditioned upon the surrender by it to the plaintiff of all patents in the field of color pigments, and with such adjustment of compensation to the plaintiff for salary in lieu of dividends on his stock in Microid as the court may deem just and right.